<pre>
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

AMGEN, INC.                  .      Case No. 1:16-cv-00853-MSG
                             .
          Plaintiff,         .
                             .      U.S. Courthouse
     v.                      .      601 Market Street
                             .      Philadelphia, PA 19106
AUROBINDO PHARMA, LTD.       .
And AUROBINDO PHARMA         .
USA, INC.                    .
                             .      February 16, 2018
          Defendants.        .      1:35 p.m.
                             .
. . . . . . . . . . . . . .
</pre>

                 TRANSCRIPT OF PRETRIAL CONFERENCE
             BEFORE HONORABLE MITCHELL S. GOLDBERG
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:           JOHN D. MURNANE, ESQ.
                         JOSHUA ROTHMAN, ESQ.
                         ALICIA RUSSO, ESQ.
                         FITZPATRICK, CELLA
                         1290 Avenue of the Americas
                         New York, New York 10104

                         JACK BLUMENFELD, ESQ.
                         MORRIS NICHOLS
                         1201 North Market Street
                         Wilmington, Delaware 19899

                         LOIS KWASIGROCH, ESQ.
                         1 Amgen Center Drive
                         Thousand Oaks, California 91320

                         WENDY WHITEFORD, ESQ.
                         Amgen Associate General Counsel

                         ERIC AGOVINO, ESQ.
                         Senior Director, Corporate Counsel

APPEARANCES - CONTINUED

| | |
|---|---|
| For Defendant<br>Amneal Pharma: | JAKE M. HOLDREITH, ESQ.<br>OREN LANGER, ESQ.<br>KELSEY THORKELSON, ESQ.<br>ROBINS KAPLAN<br>800 LaSalle Avenue #800<br>Minneapolis, Minnesota 55402 |
| | ALAN SILVERSTEIN, ESQ.<br>POTTER ANDERSON<br>1313 North Market Street<br>Hercules Plaza, 6th Floor<br>Wilmington, Delaware 19899 |
| For Defendant<br>Watson and Actavis | KAREN KELLER, ESQ.<br>SHAW KELLER<br>1105 North Market Street, 12th Floor<br>Wilmington, Delaware 19899 |
| | CHRIS ESSIG, ESQ.<br>WINSTON AND STRAWN<br>35 West Wacker Drive<br>Chicago, Illinois 60601 |
| For Defendant<br>Dr. Reddy's Lab: | MARTIN P. PAVANE, ESQ.<br>JOSEPH BELLEW, ESQ.<br>MARILYN NEIMAN, ESQ.<br>COZEN O'CONNOR<br>277 Park Avenue, #20<br>New York, NY 10172 |
| For Defendant<br>Cipla: | SARA BUSSIERE, ESQ.<br>BAYARD, P.A.<br>600 North King Street<br>Wilmington, Delaware 19801 |
| For Defendant<br>Mylan: | SAMATIOS STAMOULIS, ESQ.<br>STAMOULIS AND WEINBLATT<br>6 Denny Road, Suite 307<br>Wilmington, Delaware 19809 |
| For Defendants<br>Piramal, Zydus<br>And Cadila | DAVID BILSON, ESQ.<br>PHILLIPS GOLDMAN<br>1200 North Broom Street<br>Wilmington, Delaware 19806 |

APPEARANCES - CONTINUED

| | |
|---|---|
| For Defendant<br>Piramal only: | AARON BARKOFF, ESQ.<br>MCANDREWS HELD<br>500 West Madison Street, 34th Floor<br>Chicago, Illinois 60661 |
| For Defendant<br>Aurobindo: | MARY MATTERER, ESQ.<br>MORRIS JAMES<br>500 Delaware Avenue, Suite 1500<br>Wilmington, Delaware 19899 |
| | STEVEN SKLAR, ESQ.<br>LEYDIG, VOYT & MAYER<br>180 North Stetson Avenue, Suite 4900<br>Chicago, Illinois 60601 |
| For Defendant<br>Strides: | JAMES GREEN, ESQ.<br>SEITZ, VAN OGTROP AND GREEN<br>222 Delaware Avenue, Suite 1500<br>Wilmington, Delaware 19899 |
| Audio Operator: | S. SONNIE |
| TRANSCRIBED BY: | Eileen Dhondt, CET-807<br>Aequum Legal Transcription Services<br>6934 East Almeria Road<br>Scottsdale, AZ 85257 |

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1                          PROCEEDINGS

2              (Call to the Order of the Court)

3              (Proceedings commence at 1:35 p.m.)

4                   DEPUTY CLERK:  All rise.  Court is now in session.

5     The Honorable Mitchell S. Goldberg presiding.

6                   THE COURT:  That's a lot of lawyers in the room.  What

7     did I get myself into here?  Have a seat.  Good afternoon,

8     everybody.

9                   IN UNISON:  Good afternoon.

10                  THE COURT:  Let's start with identifying the lawyers.

11    My preference, and we'll figure each other out as we go along,

12    my preference is I'm going to have a lot of questions today and

13    my preference is that one lead counsel per side.  So, for

14    plaintiff, and I understand there's a lot of related cases and

15    lawyers are here for that.  Maybe there will be groupings of

16    defendants.  We'll find out, but I prefer one counsel speak for

17    each side.  If you've divided up issues, as I know is done in

18    patent cases, that's fine, too, when we get to issues, but what

19    I don't want is three lawyers chiming in on the same issue.

20    It's just too unwieldy and too confusing.

21                  So, tell me who is going to be the spokesperson for

22    the plaintiff and then feel free to introduce your team.

23                  MR. MURNANE:  Good afternoon, Your Honor.  John

24    Murnane, M-U-R-N-A-N-E.

25                  THE COURT:  M-U-R --

1        MR. MURNANE:  -- N-A-N-E.

2        THE COURT:  Okay.

3        MR. MURNANE:  And with me, my co-counsel Jack

4   Blumenfeld.

5        MR. BLUMENFELD:  Good afternoon, Your Honor.

6        THE COURT:  Good afternoon.

7        MR. MURNANE:  Joshua Rothman.

8        MR. ROTHMAN:  Good afternoon.

9        MR. MURNANE:  Lois Kwasigroch.

10        THE COURT:  You're going to have spell that one.

11        MS. KWASIGROCH:  K-W-A-S-I-G-R-O-C-H.

12        MR. MURNANE:  If I may, Your Honor?

13        THE COURT:  Sure.

14        MR. MURNANE:  Wendy Whiteford, Eric Agovino.

15        THE COURT:  Spell it.

16        MR. AGOVINO:  A-G-O-V-I-N-O.

17        MR. MURNANE:  And Alicia Russo.

18        THE COURT:  Okay.  Nice to meet you all.

19        MR. MURNANE:  Good afternoon, Your Honor.

20        THE COURT:  All right.  And, defense, tell me when you

21   introduce yourselves who you represent and explain if you want.

22   If I'm right, that there's going to be one counsel for maybe two

23   or three defendants or maybe not.  Go ahead.   Whoever wants to

24   go first.

25        MR. HOLDREITH:  Yes, Your Honor.  My name is Jake.

1    Last name Holdreith.  I'm representing --

2                  THE COURT:  Can you spell it?

3                  MR. HOLDREITH:  Yes, sir.  H-O-L-D-R-E-I-T-H.  I've

4    got Amneal in this case.  I don't represent any of the other

5    defendants.  To answer Your Honor's question, we have very much

6    tried to coordinate in this defense group as much as possible

7    and to assign responsibility for questions we expect from Your

8    Honor today, but there probably are some nuances where people

9    will want to speak on behalf of their own client today.

10                 THE COURT:  Sure.

11                 MR. HOLDREITH:  With me from my office at Robins

12   Kaplan is Oren Langer.

13                 MR. LANGER:  Good afternoon, Your Honor.

14                 THE COURT:  Could you spell your last name?

15                 MR. LANGER:  L-A-N-G-E-R.

16                 THE COURT:  And also Kelsey Thorkelson.

17                 MS. THORKELSON:  Good afternoon, Your Honor.

18                 THE COURT:  Spell your last name.

19                 MS. THORKELSON:  T-H-O-R --

20                 THE COURT:  Did you say C --

21                 MS. THORKELSON:  T as in Tom.

22                 THE COURT:  T as in Tom.

23                 MS. THORKELSON:  H-O-R-K-E-L-S-O-N.

24                 THE COURT:  Got it.

25                 MR. HOLDREITH:  Your Honor, we have a client

1    representative here today.  Would you like that on the record?

2              THE COURT:  If you want.

3              MR. HOLDREITH:  Mr. Vikiak Cowsha (phonetic).

4              MR. COWSHA:  Good morning, Your Honor.  Good

5    afternoon.  Sorry.

6              THE COURT:  Good afternoon.

7              MR. HOLDREITH:  Thank you, Your Honor.

8              MR. SILVERSTEIN:  Your Honor, also on behalf of

9    Amneal, Alan Silverstein, from Potter Anderson.

10             THE COURT:  Okay.  All right.  And what about the

11   related cases?

12             MS. KELLER:  Good afternoon, Your Honor, Karen Keller

13   of Shaw Keller on behalf of Watson and Actavis defendants and

14   with me today is Chris Essig.

15             THE COURT:  One second.  So Watson and Actavis?

16             MS. KELLER:  Yes.

17             THE COURT:  And your last name is?

18             MS. KELLER:  Keller, K-E-L-L-E-R.

19             THE COURT:  Okay.

20             MS. KELLER:  And Chris Essig from Winston and Strawn.

21             MR. ESSIG:  Essig.  E-S-S-I-G.

22             MS. KELLER:  And our client representative in the

23   back, Vicky Scutaro (phonetic) from Actavis.

24             MR. BELLEW:  Good afternoon, Your Honor.  Joseph

25   Bellew of Cozen O'Connor on behalf of Dr. Reddys' Laboratories

1  and with me is --

2          THE COURT:  One second.  Who is your client?

3          MR. BELLEW:  Dr. Reddys' Laboratories.  DRL, Your

4  Honor, for short.

5          THE COURT:  DRL.  And I saw your name, Mr. Bellew,

6  amongst counsel.  It's been so long.

7          MR. BELLEW:  Yes, it has.

8          THE COURT:  This is probably unnecessary, but everyone

9  should know Mr. Bellew and I worked together for a long -- too

10  long ago, long time ago at Cozen O'Connor.  I used to work there

11  and you're still there.  Good for you.

12          MR. BELLEW:  Still there, Your Honor.

13          THE COURT:  Still there.  It was at least 20 years

14  ago.  I can get the numbers, but everyone needs to know I left

15  there as a partner, but not with any equity, shares in the firm,

16  no buy-out or anything like that.  I just left and went to the

17  US Attorney's Office and they wished me well and that's it.  So

18  I have no connection at all to Cozen O'Connor, but everyone

19  should know I do know and respect counsel.

20          MR. BELLEW:  Your Honor, with me is Martin Pavane.

21  P-A-V-A-N-E.

22          MR. PAVANE:  Good afternoon.

23          MR. BELLEW:  Of the New York office and Marilyn

24  Neiman, N-E-I-M-A-N, also from Cozen's New York office.

25          MS. NEIMAN:  Good afternoon.

1          THE COURT:  Okay.  And you said just DRL, Mr. Bellew?

2          MR. BELLEW:  It's two entities, Your Honor.  It's Dr.

3  Reddy's Laboratories, Limited and Dr. Reddys' Laboratories,

4  Incorporated and we refer to them collectively as DRL.

5          THE COURT:  Yeah.  Keep it as simple as possible.

6  Thank you.

7          MS. BUSSIERE:  Good afternoon, Your Honor.  Sara

8  Bussiere from Bayard on behalf of Cipla.

9          THE COURT:  Spell your client's name.

10          MS. BUSSIERE:  C-I-P-L-A.

11          THE COURT:  Uh-huh.  And your last name is?

12          MS. BUSSIERE:  Bussiere.  B-U-S-S-I-E-R-E.

13          THE COURT:  Got it.

14          MS. BUSSIERE:  And I'm joined by Neïl Patel.

15          MR. PATEL:  Good afternoon.  Patel, P-A-T-E-L.

16          MS. BUSSIERE:  And Elizabeth Weiskopf.

17          MS. WEISKOPF:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.  Weiskopf?

19          MS. WEISKOPF:  Yes.  It's W-E-I-S-K-O-P-F.

20          THE COURT:  K-O-P-F.  Got it.  Thank you.

21          MR. STAMOULIS:  Good afternoon, Your Honor.  Stam

22  Stamoulis.  I am here on behalf of the two Mylan entities.

23  Mylan Pharma, Inc. and Mylan, Inc.

24          THE COURT:  We'll just say Mylan.  Okay.

25          MR. STAMOULIS:  Mylan.  Thank you, Your Honor.

1          THE COURT:  Good to see you, Mr. Stamoulis.

2          MR. STAMOULIS:  Thank you.  And this is Derek Neilson

3   from Alstin and Bird.

4          THE COURT:  What's the last name?

5          MR. NEILSON:  Neilson.  N-E-I-L-S-O-N.

6          THE COURT:  Got it.

7          MR. NEILSON:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. BILSON:  Good afternoon, Your Honor.  My name is

10   David Bilson.  I'm here for --

11          THE COURT:  Spell your last name.

12          MR. BILSON:  B-I-L-S-O-N.  I'm here for three

13   defendants, Piramal, Zydus --

14          THE COURT:  Speak up.  I'm having trouble hearing.

15          MR. BILSON:  I'm here for three defendants, Piramal --

16          THE COURT:  Spell it.

17          MR. BILSON:  -- Zydus and Cadila.

18          THE COURT:  Spell them, please.

19          MR. BILSON:  P-I-R-A-M-A-L, Zydus, Z-Y-D-U-S, and

20   Cadila, C-A-D-I-L-A.

21          THE COURT:  Spell the last one again.

22          MR. BILSON:  C-A-D-I-L-A.

23          THE COURT:  C-I-D-I-L-A.

24          MR. BILSON:  C-A-D-I-L-A.

25          THE COURT:  Got it.

```
1            MR. BILSON:  And with me in court for Piramal only is

2   Aaron Barkoff.

3            MR. BARKOFF:  Good afternoon.

4            THE COURT:  Good afternoon.

5            MS. MATTERER:  Good afternoon, Your Honor.  Mary

6   Matterer on behalf of Aurobindo.

7            THE COURT:  Spell that, please.

8            MS. MATTERER:  And then I have with me is --

9            THE COURT:  Can you spell your client's -- your

10  client's -- spell client.

11           MS. MATTERER:  M-A-T-T --

12           THE COURT:  M-A-T-T --

13           MS. MATTERER:  E-R-E-R.

14           THE COURT:  No.  I thought that was your name.  Okay.

15  Who is your client?

16           MS. MATTERER:  Aurobindo.

17           THE COURT:  That's what I want you to spell.

18           MS. MATTERER:  A-U-R-O-B-I-N-D-O.

19           THE COURT:  A-U-R --

20           MS. MATTERER:  O --

21           THE COURT:  B-I-N-D-O?

22           MS. MATTERER:  Correct.  And I have Steven Sklar from

23  the law firm of Leydig, Voyt and Maher.

24           THE COURT:  Sklar?

25           MR. SKLAR:  S-K-L-A-R, Your Honor.
```

1          THE COURT:  Got it.  Thank you.

2          MR. SKLAR:  Also, my colleague Greg Bays is here as

3     well.  B-A-Y-S.

4          MR. GREEN:  James Green, Your Honor.

5          THE COURT:  All right.  Let the record reflect.  This

6     is the first time I've ever had to use page two of a legal pad

7     to get all lawyers.  Go ahead.

8          MR. GREEN:  I made the top of the page.  James Green

9     for Strides, S-T-R-I-D-E-S.

10          THE COURT:  S-T-R-I-D-E-S.

11          MR. GREEN:  And with me is Ian Scott.

12          THE COURT:  Mr. Scott.  Okay.  Okay.  That's

13     everybody.

14          All right.  So let me tell you where I'm at and we can

15     have a long dialogue and figure this out.  Everyone is familiar

16     with TC Heartland.  Everyone is familiar with the situation in

17     the District of Delaware with Judge Robinson.  You don't have to

18     write this down.  Trust me.  Just listen.  This is not going to

19     be earth shattering.  Judge Robinson and Judge Sleet going

20     senior.  I actually took a look at some patent filing statistics

21     around the country about four months ago and it's -- I don't

22     think it's an understatement to say that the Delaware Court is

23     in crisis.  It sounds over-dramatic to say that, but I don't

24     know how two designated judges are handling all of the cases

25     that are being filed.

1          The last time I looked at the numbers, Delaware was

2    about to be number one patent court in the country and I bet you

3    it is right now as far as -- as far as filings.  The chief judge

4    of our circuit, Brook Smith, asked four judges from my court to

5    assist.  We have sort of informally, so it's Judge McHugh, Judge

6    Kearney, Judge Robreno and myself, we have informally sort of

7    divvied up the subject matter.  I have volunteered to take the

8    bulk of the patent work.  I have taken about 25 Delaware patent

9    cases and none of this comes with a pass on my docket in the

10   EDPA.  I've probably taken too many Delaware patent cases.  My

11   staff is about to revolt and Judge Sleet was nice enough to give

12   me the services of Angela Whitesell (phonetic) who is here.

13   She's a law clerk from Delaware.  She's going to be with me on

14   the case.

15          I don't know if this is confidential or not, but I'm

16   going to say it.  When the Chief of Delaware, Judge Stark,

17   called me and said we have a trial that's queued up from Judge

18   Sleet, he offered a bunch of trials that they needed help with.

19   He definitively said, as he should, if you take it, you have a

20   trial date, but we totally understand that that trial date is

21   subject to your schedule and to change the trial date if you

22   deem necessary.

23          So I took this case not too long ago.  I've been doing

24   as best as I can.  I've had a lot scheduled the last 10 days.

25   I've done as best as I can to understand the case.  I think that

1    it's unlikely that the trial date is going to hold and what I

2    need all the lawyers in the room is to understand that -- and I

3    think you do, but I want to say this so I'm clear.  I was not

4    assigned to this case taken out of the stratosphere with no

5    other responsibilities.  I was assigned to this case with 24

6    other Delaware patent cases and a full docket in the Eastern

7    District of Pennsylvania.  So while -- when I was trying cases,

8    I liked certainty, I liked knowing when the trial date was.  You

9    had a trial date with Judge Sleet.  You probably -- that trial

10   date is probably going to be subject to being continued.  I

11   understand that that's going to cause some logistical issues,

12   but it's just the way it is.  There's nothing I can do about it

13   and complain to Congress, you know, that Delaware needs more

14   judges.  Okay.  I think they do.  I don't know how they're going

15   to manage with four.  I think I'll probably stay on once they're

16   up to speed with four, but those are decisions above my pay

17   grade.

18           So everyone needs to be -- get in a flexible mindset.

19   Okay.  I'm not going to -- I don't want to cause alarm and I

20   know what you're thinking.  We've got these expensive experts.

21   They're scheduled to come in here and they've got to fly in from

22   overseas I think some of them I was told.  And how's that all

23   going to work out?  It's going to work out.  Okay.  I'm going to

24   be flexible with you.  I'm going to work with you.  It's a bench

25   trial so that gives us an enormous amount of flexibility.  It's

1   likely that we'll try the case in chunks, maybe a couple of days

2   in a row.  I don't want to string it out because these patent

3   cases in my experience if you put your head into them and then

4   you step away from it for three or four months, it's very hard

5   to get your head back into it.

6          So we'll have some sense by the end of the day or at

7   the latest Tuesday if I have to do some homework over the

8   weekend which I will about how this case is going to unfold, but

9   I need everyone to get in a frame of mind where you understand

10  that -- what my docket looks like right now plus 24 other cases

11  from Delaware.  I'll do the best I can to get you quick justice

12  here.  Okay.

13         So where I really would like to start logically is I

14  want to -- I've read as much as I could read.  I saw some

15  submission.  Was there a submission findings of facts and

16  conclusions of law that was in excess of 700?  Okay.  I did read

17  all that and we'll talk about that when we get to the part on

18  the verdict, but I just would like sort of a mini opening

19  statement dissertation from counsel and tell me what your case

20  is about.  Tell me what you're going to prove.  Don't be too

21  technical.  Don't get into the weeds too much.  Understand that

22  I've read a couple summary memos that Ms. Whitesell has

23  prepared, but understand, you folks know the case on a scale of

24  one to ten.  A ten, you're two weeks -- what's the Sleet trial

25  date by the way?  March what --

1          UNIDENTIFIED SPEAKER:  March 5, Your Honor.

2          THE COURT:  So you're a couple of weeks away from

3    trial and I just got this case.  So make your presentation

4    consistent with my very superficial understanding of the case so

5    far.  And then we'll have some dialogue and then we'll figure

6    out where we're going to go, but I want to understand the case

7    first.  So let's start with plaintiff.

8          A couple of things.  Don't feel compelled to come to

9    counsel table.  If you're more comfortable there, you can stay

10   there.  I mean, the podium.  You can stay at counsel table.  You

11   can stand wherever you want.  You don't have to stand if you're

12   more comfortable and you want to sit.  You don't have to ask to

13   approach the bench.  Just talk to me wherever you're most

14   comfortable.

15         MR. MURNANE:  I won't ask to approach, Your Honor, but

16   if I may, I'm bringing up a couple of pieces of paper.

17         THE COURT:  Sure.  That's fine.

18         MR. MURNANE:  Forgive me, Your Honor.

19         UNIDENTIFIED SPEAKER:  Can I just look over your

20   shoulder?

21         MR. MURNANE:  I have one myself, but if you would

22   share with your colleagues --

23         UNIDENTIFIED SPEAKER:  Sure.

24         MR. MURNANE:  John Murnane, Your Honor, for plaintiff.

25   Thank you very much, Your Honor, for taking this case especially

1   in the circumstances.  I'd like to address, if I may, before I

2   go into a summary of plaintiff's case, address the point Your

3   Honor made about logistical issues and being flexible.

4         I have just handed Your Honor a sheet and forgive the

5   handwritten annotation.  We just got -- I just was given some

6   information.  I wrote it down right here live today.  This is

7   where we stand with the summary of the defendants' status in

8   this case and why the March 5th date came about.

9         We had, at the beginning, 15 defendants in this case

10  and we have a follow on case with 3 defendants and the case --

11  the case was started in the late summer and fall of 2016.  All

12  the parties recognized early on that we needed to have a trial

13  date early because there's another patent involved with respect

14  to the drug SENSIPAR.  The drug here is SENSIPAR and I'll be

15  explaining that in some detail, Your Honor, in a few minutes.

16        However, here in this courthouse back in November of

17  2010, we tried the earlier SENSIPAR case, Amgen against Teva

18  Barr, and that's the compound itself.  The cinacalcet compound

19  itself, Your Honor.  This is the formulation case involving the

20  invention where the inventors learned how to deliver cinacalcet

21  to the cells of the patients in need thereof.  That was not

22  something that had been discovered before.  So that was just the

23  discovery of the cinacalcet compound and we prevailed in that

24  case before Chief Judge Bartle and the patent in that case

25  expires on --

1          THE COURT:  Tried in this court?  Judge Bartel?

2          MR. MURNANE:  Yes.  It was a Delaware case, Your

3    Honor, but in those days, they were a little short-handed in

4    Delaware as well and so that was a Delaware case, but Chief

5    Judge Bartle tried it here and as I said --

6          THE COURT:  That was about eight years ago, right?

7          MR. MURNANE:  Yeah.  The ruling came in January of

8    2011, Your Honor.

9          THE COURT:  2011.  Okay.

10          MR. MURNANE:  Uh-huh.  And that's the compound.

11          THE COURT:  What's the compound?  Spell that, please.

12          MR. MURNANE:  Cinacalcet.  C-I-N-A-C-A-L-E-T (sic) --

13          THE COURT:  Go ahead.

14          MR. MURNANE:  That was the compound case.  Now, in

15    this case, we have the formulation.  How do you get cinacalcet

16    to the cells of the patients in need?  And I'll speak a little

17    bit more about those patients in a moment, Your Honor.

18          And so when you have a drug situation, once there's a

19    compound patent, nobody -- if it's a valid compound patent and

20    it had been adjudicated as valid, nobody can use it for any

21    reason.  Okay.  Whether it's for a formulation or for anything

22    else.  So that's been governing the marketplace since Judge

23    Bartle's ruling.  All right.  And that patent expires on March

24    8th, 2018.

25          THE COURT:  What's the patent number?

1          MR. MURNANE:  The last three numbers are 068, Your

2    Honor.  Forgive me --

3          THE COURT:  Yeah, I just want the last three.

4          MR. MURNANE:  It's the 068 patent.  Okay.  I don't

5    have the --

6          THE COURT:  That's fine.  I just want the last three.

7          MR. MURNANE: It's the 068 patent, Your Honor.

8          And so the reason that what I'm about to tell you

9    happened at the conference we had with Judge Sleet in February

10   of 2017, which was the first conference we had in the cases,

11   everybody realized that if we didn't have a trial or a

12   commitment from people not to launch, one or the other, prior to

13   March 8th, 2018, there was the possibility of what they call a

14   launch at risk.  Okay.

15         If a generic has approval from the FDA --

16         THE COURT:  I know what a launch at risk is.

17         MR MURNANE:  I'm sorry.

18         THE COURT:  It's okay.

19         MR. MURNANE:  Forgive me, Your Honor.

20         THE COURT:  It's all right.  Go ahead.

21         MR. MURNANE:  So the concern was if we don't have a

22   judicial resolution prior to March 8th, then there's the

23   possibility of a launch at risk and everybody understood that so

24   we boldly collectively the defendants plus plaintiff asked if we

25   could have a January 2018 trial date.  Judge Sleet said the

1    earliest I could do is March 5th.  So we've been operating under

2    that premise.

3              THE COURT:  Yeah.

4              MR. MURNANE:  Okay.

5              THE COURT:  But that will have to be a business

6    decision that everyone will have to make if we can't get the

7    trial done before March 8th.

8              MR. MURNANE:  Exactly, Your Honor.  And so what we've

9    endeavored to do is we've been getting closer and this sheet

10   reflects the activity.  We have the defendants on the sheet;

11   whether or not they have tentative approval from the FDA,

12   whether or not they're subject to the 30 month stay.  Only

13   Piramal is.  I can speak about 30 month stay if Your Honor would

14   like and then --

15             THE COURT:  I can extend that; can't I?

16             MR. MURNANE:  Well, Your Honor, we're not going to

17   really need to worry about the 30 month stay, okay, because we

18   only have one Piramal and these cases started in the latter part

19   of 2016, so we're going to be okay with that.  The 30 months is

20   not going to be a problem for the foreseeable future.

21             But what we have is we have the next column, agreed to

22   stay off the market, question mark, and then the final column,

23   agreed to give FDA correspondence.  We had some discovery

24   requests early in the case asking for different kinds of

25   information including correspondence with the government and we

1    have now updated that because now that we're getting close to

2    this critical date, we wanted to know whether or not the folks

3    are having the correspondence which would indicate that they're

4    ready to launch.  And you'll see in that column, the last

5    column, we've received a number of responses.  There have been a

6    couple of instances where we've received no response.

7         So now coming back to the critical one, agreed to stay

8    off the market, for the first two on the list, we have no.

9    Okay.  No, they won't agree to stay off the market and for the

10   rest we have no response.  So we certainly understand everything

11   Your Honor has said and the reason that -- the reason that we

12   established with, of course, the Court's blessing, the schedule

13   that we had which was effectively a rocket docket schedule

14   because we thought it would be a waste of judicial resources as

15   well as the parties' resources to have to go through some TRO

16   and PI fire drills prior to March 8th, 2018, so the idea was get

17   the case tried and -- or at least get it started.  If we were

18   into the trial and infringement goes first, if we were into the

19   trial, then if, in fact, there were a risk of a potential

20   launch, we could at that point during the trial still and before

21   the 8th of March, we could say well, now that Your Honor has

22   heard this evidence with respect to infringement, please, based

23   on this grant a TRO.  We could do some briefing at the time or

24   whatever, but we wouldn't have to go through the classic fire

25   drills that you have to go through when you're seeking a TRO and

1   PI without having any evidentiary information before Your Honor.

2               THE COURT:  But if we don't do that and there's a

3   launch at risk, you still have remedies, right?

4               MR. MURNANE:  Well, Your Honor, unfortunately in our

5   business, you can't really put Humpty Dumpty back together

6   again.

7               THE COURT:  You can't?  What about damages?

8               MR. MURNANE:  Well, Your Honor, what happens in this

9   market, what happens in the drug field is as soon as there's a

10  launch at risk, historically, 74 percent of the market will go

11  to the generic that launched at risk.  Okay.  Historically.

12  Well, you know, 70 to 80 percent and that's a huge thing.  And

13  then what happens -- I've been involved in these, Your Honor.

14  What happens is the formularies, the government, the insurance

15  companies, the agencies, the entity that actually pay the bills,

16  they say all right, SENSIPAR, you were in this tier, tier 1.

17  Now because of this, if you want to still get any kind of

18  payment, you have to go down to a lower tier.  Okay.

19              Many requirements of the government and insurance

20  companies say that scripts, that is prescriptions, have to be

21  filled -- have to be filled by a generic.  So that's why they

22  get automatically three-quarters of the market just like that.

23              THE COURT:  Does this discussion go to we have to

24  start the trial before March 8th?

25              MR. MURNANE:  Your Honor, if we -- if we --

1          THE COURT:  That's okay if that's the answer.

2          MR. MURNANE:  Well, that would be the preference --

3          THE COURT:  And because once we start the trial,

4    you're going to convince me to issue a TRO for those who don't

5    agree to not go on the market.  Is that where you're going with

6    this?

7          MR. MURNANE:  If we had to do that, Your Honor.  The

8    easier way to go -- the easier way to go, and it's our third

9    column on this page, would be to agree to stay off the market

10   pending Your Honor's decision.  So, in other words --

11         THE COURT:  Right.  But that's their decision.

12         MR. MURNANE:  Correct, Your Honor.

13         THE COURT:  Not yours.  Right.

14         MR. MURNANE:  And if they won't agree --

15         THE COURT:  Uh-huh.

16         MR. MURNANE:  -- and this would be a great day to get

17   that resolved on the record.  If they won't agree to stay off

18   the market pending Your Honor's decision, then we would have to

19   go through the motion practice.

20         THE COURT:  Okay.  So hold on for a second.  Let's --

21   because we're going -- all of us are going to be together so

22   let's get this on the table.  Okay.  Everyone in this room, all

23   you do is practice patent law, right?  Right?  Okay.  I'm a

24   generalist as a judge, never practiced patent law as a lawyer,

25   but probably have more patent experience than any other judge in

1   this district, but certainly not as much as my colleagues in

2   Delaware.  So why do I set all that out?

3          I'm not afraid to ask questions I don't know the

4   answer to, so don't be afraid to, you know, engage me in

5   dialogue.  Okay.  And some of these questions maybe sound stupid

6   to you folks.  Okay.  But isn't it -- so here's my first

7   question.  Aren't there cases where you have under the

8   Hatch-Waxman Act the 30 month window -- aren't there cases --

9   infringement cases that are tried outside of that window for

10  whatever reason there are?

11         MR. MURNANE:  It happens, Your Honor.

12         THE COURT:  And when it happens, and there's a launch

13  at risk, am I right that the patent holder can avail itself to

14  damages?  I understand it's not the perfect situation, but

15  that's available, right?

16         MR. MURNANE:  In our field -- in our field, Your

17  Honor, I'm unaware of an instance where a patent owner wanted to

18  do that rather than sought the immediate emergency relief.

19         THE COURT:  Of course.  Of course.  Of course.  But as

20  I explained to everybody, this is not a normal situation.  This

21  is a Delaware patent -- a Delaware court that is inundated and

22  has to enlist visiting judges so thus the -- there has to be

23  some thinking out of the box here.  Okay.

24         MR. MURNANE:  Understood, Your Honor.  And if I may I

25  would ask the others in the courtroom with respect to this third

1    column to do some very serious thinking about that, because, as

2    I said, you can't put Humpty Dumpty back together again.  I know

3    it sounds --

4         THE COURT:  I know it's not the optimal choice.  I get

5    it.  I do.

6         MR. MURNANE:  But, Your Honor, if I may?

7         THE COURT:  Yeah.

8         MR. MURNANE:  Amgen is a biotech company from

9    California and this is their first small molecule drug.  All

10   their other drugs were biotech big molecule drugs.  They

11   invested here when this was one would call an orphan status type

12   of situation where in those days when this medicament was

13   discovered it was going to treat very few people and the federal

14   government is so much encouraging of that situation that they'll

15   give you what's called orphan drug status and give you some

16   extra period.  Okay.

17        Amgen made this investment when they did when there

18   weren't a lot of dollars on the horizon, but they have worked

19   hard and grown the market for this drug.  It's now more than a

20   billion dollar a year drug.

21        THE COURT:  Excuse me.  And all the folks on this side

22   of the table would say they've worked equally as hard and

23   they're allowed to get on the market and they don't infringe.

24   So everyone wants to make a lot of money.  I get that.  So let's

25   take your practical suggestion which is maybe we don't have to

1  have this debate if we get more yeses, we'll stay off the

2  market.  So, according to your chart, Amneal has agreed to stay

3  off the market.  Is that correct?

4           MR. MURNANE:  No, no, Your Honor.  Please forgive me.

5  The column agree to stay --

6           THE COURT:  I'm sorry.  Agreed to stay off the market.

7  Okay.

8           MR. MURNANE:  -- no one has agreed.

9           THE COURT:  You're right.

10          MR. MURNANE:  No one, Your Honor.

11          THE COURT:  So am I right, no one is going to agree to

12  stay off the market?  Is anyone on the defense side going to

13  agree to stay off the market given the fact that you're not --

14  probably not going to get a decision from a judge before the --

15  you're not going to get a decision from a judge before March

16  8th.  You're not.  I'm telling you right now.  It's impossible.

17  So anyone want to agree to stay off the market?  I see no

18  response.

19          Okay.  So there we are. So your next -- your next

20  suggestion is do as much of the case as we can and you'll be

21  able to convince me to issue an injunction against them.

22          MR. MURNANE:  Yes, Your Honor, and if I --

23          THE COURT:  Okay.

24          MR. MURNANE:  -- may address a point, Your Honor.

25          THE COURT:  But I want to do to get to that point as

1    to whether I can digest that suggestion is I want to understand

2    your case, so I want to defer this conversation, and I want you

3    to tell me about your case.

4              MR. MURNANE:  Okay.  Thank you, Your Honor.

5              THE COURT:  Go ahead.

6              MR. MURNANE:  I'll address the infringement point that

7    Your Honor mentioned --

8              THE COURT:  Please.

9              MR. MURNANE:  -- when I was speaking about the

10   investment that Amgen had made and Your Honor noted well, the

11   defendants have done the same.  That's actually not so.  They

12   haven't.  Generics go to the government with what's called an

13   abbreviated new drug application.

14             THE COURT:  I understand the process.

15             MR. MURNANE:  So if I may --

16             THE COURT:  I've tried several Hatch-Waxman patent

17   cases.  Go ahead.

18             MR. MURNANE:  So, Your Honor, if I may, this is the

19   invention of Amgen, cinacalcet, hydrochloride, the formulation.

20   This is their invention, okay, which they spent a lot of effort,

21   money and time in doing.  The generics have copied it.  We have

22   some literal infringers here.  No difference; literal

23   infringers.  Those who say they are not infringing are

24   infringing under what we call the Doctrine of Equivalence, and

25   if you put your two hands together, Your Honor, and you see how

1   closely they align, your palms, your thumbs, your fingers, if

2   you will, they're the same except for maybe just twitch your

3   little pinky just a little bit and that's how different it is.

4            THE COURT:  Which defendants have literally infringed

5   in your opinion?  Tell me who they are.

6            MR. MURNANE:  Mylan, Cipla, Amneal and Zydus.

7            THE COURT:  Go ahead.

8            MR. MURNANE:  And so what we have here is literal

9   infringement from them and deducted from it is just a little bit

10  of changes if you will in some of the excipients for the others

11  and we have evidence that we will be offering, Your Honor, to

12  show that that is infringement under the Doctrine of

13  Equivalence.  Okay.

14           Their big defense is we're not entitled to the

15  Doctrine of Equivalence.  They say we're not entitled to the

16  Doctrine of Equivalence because of what's called prosecution

17  history estoppel.  Is that something Your Honor would like me to

18  speak about?

19           THE COURT:  I would.

20           MR. MURNANE:  Okay.  They say that because during the

21  prosecution of the patent in suit the claims were changed as

22  requested by the examiner, they say Amgen is not entitled to

23  equivalence, but we are.  The law is that you have a problem

24  with equivalence if changes were made for reasons of

25  patentability.

1          In this particular situation, Amgen gave the examiner

2    a lot of information and the examiner digested it and then the

3    examiner called Amgen's attorney and said I'm ready to allow the

4    case, but in the claim, I'd like to add some words with respect

5    to the binder.

6          Now, the words that were added by the examiner are

7    actually words that appear in the prior art, so sometimes what

8    you have is a situation, and we don't have it here, sometimes

9    you have a situation where the examiner says your claim cannot

10   be allowed because it encompasses the prior art.  I have to

11   change the claim to avoid that prior art and that's the classic

12   estoppel.  If you've changed the claim to avoid prior art, you

13   can't now come into court later on and say that something that's

14   in the prior art is an equivalent.  You can't do that.  It's not

15   fair.  All right.

16          That didn't happen in these circumstances.  The words

17   that the examiner added to the claim are in the prior art and

18   there's no dispute about this.  They're in the prior art that

19   was before the patent office.  There was only one rejection by

20   the examiner in this prosecution.  I'm sorry, Your Honor.

21          THE COURT:  It's all right.  I want to catch up on my

22   note taking.  Give me one second.

23          MR. MURNANE:  Sure.  I apologize if I went too fast.

24          THE COURT:  No, don't apologize.  Go ahead.

25          MR. MURNANE:  Even though the prosecution was

1   extensive, there was only one rejection, only one, and the

2   examiner said I'm not going to give you a patent because of this

3   particular prior art.

4            In response to that rejection, there was only one

5   claim by the applicants, but it was with respect to the

6   cinacalcet hydrochloride and it has nothing to do with their

7   prosecution of history estoppel.  Pardon me.  Nothing whatsoever

8   to it.  What their point is is that in calling up Amgen's

9   counsel and saying I will allow the case and here are my reasons

10  and then said these words that I'm adding to the claim, okay,

11  the examiner put words in which are actually in the prior art.

12  So it's not to avoid the prior art and the patent office record

13  -- this is why it's important to look at a whole record here.

14  The patent office in its wisdom knows that issued patents

15  sometimes end up in litigation and people are standing at a

16  podium like this talking, so the evidence about what happened,

17  the evidence about what happened, is in the record.  Everything

18  is supposed to be written down in the record.  Okay.

19           So the examiner wrote it down and there are some boxes

20  for an examiner to check.  If the examiner says we talked about

21  obviousness and I'm making these amendments, there's a box to

22  check for that.  That box wasn't checked.  If the examiner said

23  there was anticipation based on this prior art and I'm making

24  these changes, there's a box to check, but that wasn't checked.

25  Nothing.  So, too, with --

1          THE COURT:  What witness are you going to present to

2     refute the prosecution estoppel defense --

3          MR. MURNANE:  We're going to have --

4          THE COURT:  -- or witnesses?

5          MR. MURNANE:  I'm sorry?

6          THE COURT:  How are you going to present this?  Who

7     are your witnesses?

8          MR. MURNANE:  Well, we have our expert witnesses who

9     have been providing expert reports in this case, Your Honor, and

10    they've been deposed and so -- and we have the record.  The

11    record is the official record of the United States patent

12    trademark office.

13         THE COURT:  Does everyone agree that that record is

14    coming into evidence without any type of custodian?  The patent

15    record?

16         MR. MURNANE:  I would hope so, Your Honor.

17         THE COURT:  Are your experts -- are your experts going

18    to say that their -- prosecution estoppel; is that the proper

19    term?

20         MR. MURNANE:  Prosecution history estoppel.  The other

21    side has asked our experts about that, Your Honor.

22         THE COURT:  Okay.  Are your experts going to say that

23    it's their opinion that based on the review of the patent record

24    that their defense of, I'm just going to say prosecution

25    estoppel.  I know it's prosecution history.  Are your experts

1    going to attempt to say that that is not applicable here?

2              MR. MURNANE:  They're going to be looking at the

3    actual evidence and saying in their views as experts what the

4    record shows for the particular pages.  The pages show and don't

5    show what they show and don't show.

6              THE COURT:  Why do you need an expert for that?

7              MR. MURNANE:  Well, Your Honor, respectfully, we

8    don't, but they've asked a lot of questions of our expert, so I

9    assume they're going to do it again.  Okay.

10             THE COURT:  What I'm trying to understand is are your

11   experts going to say either, A -- here's what I see in the

12   prosecution record.  I mean you could -- if everyone agrees that

13   the prosecution record comes in, I could just look at it and you

14   could say, look at this, this and this, Judge.

15             MR. MURNANE:  Correct, Your Honor.

16             THE COURT:  Right?  Because it's in evidence and it's

17   a bench trial.

18             MR. MURNANE:  Correct.

19             THE COURT:  What I want to know is are your experts

20   and do you believe their experts are going to opine on what I

21   understand to be a legal principle that is prosecution estoppel?

22             MR. MURNANE:  I believe they will ask our experts

23   questions because they --

24             THE COURT:  I'm asking what you're going to present.

25   Are you going to ask your experts that?

1          MR. MURNANE:  I don't think -- sorry.  Right.  Your

2     Honor --

3          THE COURT:  Do you understand my question?

4          MR. MURNANE:  Yes, I do, Your Honor.  I apologize.  So

5     when one looks at a patent and one looks at a patent that's born

6     of a filed history, one looks at it from the perspective of a

7     person of ordinary skill in the art.  What does a person of

8     ordinary skill in the art say?

9          THE COURT:  I understand all that.

10         MR. MURNANE:  So our expert certainly is testifying

11    with respect to each of the issues the expert is testifying

12    about from that perspective.

13         THE COURT:  Okay.  So from that perspective, is your

14    expert going to opine on a legal theory?

15         MR. MURNANE:  The expert will opine that looking at

16    the prosecution history, one does not see an amendment for the

17    reasons of patentability.

18         THE COURT:  Okay.  Got it.

19         MR. MURNANE:  And the reason is, Your Honor, the

20    record doesn't say anything -- the record says one thing and

21    only one thing.

22         THE COURT:  Okay.  I'm not sure you need an expert to

23    make that point, but that's 20 steps ahead.  Are you going to

24    have any witnesses other than experts?

25         MR. MURNANE:  No, Your Honor.

1          THE COURT:  All experts?

2          MR. MURNANE:  Yes, Your Honor.

3          THE COURT:  How many witnesses?

4          MR. MURNANE:  Four.  Four, Your Honor.

5          THE COURT:  Four?

6          MR. MURNANE:  Yes.

7          THE COURT:  Okay.  Tell me -- I know I'm jumping all

8   over the place, so bear with me.  Tell me as concisely as you

9   can the name of your four -- so four witnesses total from your

10  side?

11         MR. MURNANE:  Yes, plus some excerpts from

12  depositions.

13         THE COURT:  Understood.  Tell me who your experts are

14  as concisely as you can.  And I know all this is in the papers

15  which I haven't gotten to and concisely what the opinion of the

16  expert is going to be.

17         MR. MURNANE:   Martin Davies (phonetic throughout);

18  infringement.

19         THE COURT:  Go ahead.

20         MR. MURNANE:  Bill Williams (phonetic throughout);

21  this invention and its significance and non-obviousness.

22         THE COURT:  Go ahead.

23         MR. MURNANE:  Bill Roush; also on the patentability of

24  this invention.

25         THE COURT:  I'm a terrible speller.  How do you spell

1   it?

2            MR. MURNANE:  R-A -- excuse me.  R-O-U-S-H.

3            THE COURT:  R-O-U-S-H.  And he's going to testify

4   about --

5            MR. MURNANE:  Also on patentability.  And --

6            THE COURT:  What do you mean by patentability?  What's

7   he going to say?

8            MR. MURNANE:  They have defense -- their essential

9   defense is obviousness.

10           THE COURT:  Okay.

11           MR. MURNANE:  So Williams and Roush are both --

12   they're not going to say the same thing, but --

13           THE COURT:  I understand.

14           MR. MURNANE:  -- because we have a lot of defendants.

15   There's a lot of ground.

16           THE COURT:  I thought they were -- you were telling me

17   their essential defense was this estoppel theory, but both, you

18   think?

19           MR. MURNANE:  Well, that's their -- that's their

20   non-infringement defense.  They also say it's an invalid patent.

21           THE COURT:  Got it.  And who is the last one?

22           MR. MURNANE:  Dr. Feigel.  F-E-I-G-E-L.

23           THE COURT:  F-

24           MR. MURNANE:  E-I-G-E-L.

25           THE COURT:  Go ahead.

1          MR. MURNANE:  Unexpected results which also goes to

2  patentability.

3          THE COURT:  Okay.

4          MR. MURNANE:  So there are essentially two issues in

5  the case, Your Honor, infringement and validity.

6          THE COURT:  Yeah.

7          MR. MURNANE:  Dr. Davies on infringement and the other

8  three on validity.

9          THE COURT:  Okay.  I'm just spitballing here, so bear

10 with me.  Does it -- given the time crunch, my time crunch and

11 your time crunch, and understanding on the defense side, I will

12 hear you out on all of this.  I promise.  Does it make any

13 scheduling sense to bifurcate the matter and by that I mean

14 litigate just infringement and infringement only and that would

15 allow me to do this quicker and give you -- turn around a

16 decision on that quicker as opposed to litigating infringement

17 and invalidity.  What's your view on that?

18         MR. MURNANE:  I think it would be something we'd be

19 very interested in from Amgen's perspective.  However, I think

20 we would still need from the defendants their perspective as to

21 what -- as to whether or not --

22         THE COURT:  Of course.  I'm giving you an opportunity

23 to tell me what you want.

24         MR. MURNANE:  Well --

25         THE COURT:  They're going to give me their

1   perspective.

2            MR. MURNANE:  Again, Your Honor, what I want to avoid

3   here is the necessity of a fire drill which will take even more

4   of Your Honor's time and the Federal Circuit's time because if

5   after we get Your Honor's decision on infringement, but we still

6   don't have a decision --

7            THE COURT:  I know.  They both have to go to the

8   circuit.

9            MR. MURNANE:  On an emergency basis.

10           THE COURT:  Right.

11           MR. MURNANE:  If they won't agree to stay off --

12           THE COURT:  That's what makes these cases so

13   challenging.  There's so many moving parts to these cases.

14           MR. MURNANE:  Exactly, Your Honor.  Exactly.  That's

15   why we were just hoping --

16           THE COURT:  But I thought you would welcome that

17   suggestion given the fact that you -- I thought you said you

18   wanted me to hear your infringement case and I'm going to be

19   wowed by it and then say you can't go on the market.  I thought

20   you'd welcome that idea.

21           MR. MURNANE:  Yes, Your Honor.  If Your Honor is wowed

22   by me -- I hope you would be.

23           THE COURT:  I thought you'd be wowed by it.

24           MR. MURNANE:  Forgive me, Your Honor.

25           THE COURT:  It's okay.

1          MR. MURNANE:  I apologize.

2          THE COURT:  Look.  Don't -- stop apologizing.  You

3    don't have to be so polite.

4          MR. MURNANE:  We hope Your Honor would be wowed by the

5    case.  But, if after hearing infringement, we say, Your Honor,

6    you've heard infringement.  We respectfully request a TRO.  We

7    get 10 days.  Now, Your Honor has a very busy schedule and we

8    know TROs go 10 days and you can renew them for 10 days, but

9    that gives us at most 20 days.

10         THE COURT:  Uh-huh.

11         MR. MURNANE:  So if the defendants are still chomping

12   at the bit -- I don't know if they are.  If anybody really wants

13   to go on, it gives us 10 to 20 days and then we're going to have

14   to see whether we're in PI motion land at that point.

15         THE COURT:  Right.  Am I pronouncing your name right?

16   Murnane?

17         MR. MURNANE:  Murnane.

18         THE COURT:  Murnane.  Best estimate.  I'm not holding

19   you to this.  Direct and cross.  Davis, William, Roush, Fiegel I

20   think you said.  Give me your best estimate as to how long their

21   testimony will be.  Just ballpark it.

22         MR. MURNANE:  If I may, Your Honor.  The 7 days that

23   had presently been scheduled, we figure Davies is going first

24   for about a day and a half and then the defendant is putting on

25   their witnesses and we would have whatever was left over in that

1    7 day period for Williams, Roush and Feigel.  So we were going

2    to have Davies first, because it's our burden by a preponderance

3    of the evidence.  And then they have -- in validity, they're

4    burdened by clear and convincing evidence and after we put

5    Davies up, they're going to have their witnesses and I don't

6    know how many they're going to call, but they each have an

7    expert witness on non-infringement.

8            THE COURT:  Right.

9            MR. MURNANE:  So the reason I answered the question

10   the way I did, Your Honor --

11           THE COURT:  No, it makes sense.  Yeah.

12           MR. MURNANE:  -- is respectfully it's going to be --

13   it's really the infringement issue and how long -- I think we're

14   a day and a half with direct and cross.  Okay.

15           THE COURT:  Understood.  How long do you think

16   Williams, Roush and Feigel will be, understanding that sequence?

17   Just ballpark it for me.

18           MR. MURNANE:  Two to three days, Your Honor.

19           THE COURT:  Total or each?

20           MR. MURNANE:  Oh, total, complete.  Yes.  Yes.

21   Depending on the length of cross.

22           THE COURT:  Okay.  What's the difference between and I

23   asked you to be concise, you can drill down a little bit.

24   What's the difference between Davis' testimony and Williams --

25   Williams or William --

1          MR. MURNANE:  Williams.

2          THE COURT:  Williams' testimony.

3          MR. MURNANE:  Oh, they're very different, Your Honor.

4    Davies -- what Dr. Davies does is Dr. Davies will be telling you

5    about the claimed invention because infringement is looking at

6    the claim, okay, and does the claim read on the accused

7    products.  Okay.  So he'll be telling you about the claimed

8    invention in the context of how it's Amgen's drug, the claimed

9    invention, and then one through however many left.  We started

10   with 15.  We're at 9 now and maybe we'll be fewer by then

11   because talks are going on with 2 as we speak and so we don't

12   know.  But however many there are, he will then go -- and now,

13   with respect to the first one, A, I believe -- firstly, he would

14   say, "Your Honor, I have read, I have seen and it's my view --

15   my opinion that this is infringement because."

16          THE COURT:  And here's why and he'd have to go -- so

17   presently we're talking about one, two, three, four, five, six,

18   seven -- nine.

19          MR. MURNANE:  Nine.

20          THE COURT:  He'd have to repeat that testimony nine

21   times.

22          MR. MURNANE:  Well, it's because they're different.

23   You know, they're not all --

24          THE COURT:  Understood.

25          MR. MURNANE:  -- there are similarities, Your Honor.

1  There are similarities, but -- and it wouldn't really take too

2  long once Your Honor has heard the beginning.

3          THE COURT:  Yeah.  That makes sense.  Okay.  All

4  right.  Let me chat with the defense side for a little bit.

5          MR. MURNANE:  If I could just make one -- I was almost

6  about -- I'm almost finished.  Prosecution history estoppel as I

7  said --

8          THE COURT:  I did interrupt you there.  Go ahead.

9          MR. MURNANE:  It's all right.  It's the last point.

10 There is one thing in the record that speaks to it and it's

11 Amgen's counsel statement.  After those words were added, okay,

12 after those words were added, Amgen's counsel, on the record,

13 and again this all has to be on the record so that people can't

14 say yeah, I think this is what happened.  It's all on the

15 record.  Amgen's counsel said this is agreed to because we still

16 have our equivalents.  Okay.  We still have our equivalents.

17 After that, the examiner had a number of papers.  They had

18 another interview after.  The examiner never said you're wrong

19 about that equivalent.  So the record is the examiner has said

20 nothing about reasons of patentability with respect to that

21 claim and Amgen's counsel said we still have equivalents.

22         THE COURT:  Understood.

23         MR. MURNANE:  Thank you, Your Honor.

24         THE COURT:  Thank you.  All right.  We have eight sets

25 of defense counsel, so I mean there's got to be some significant

1   overlap in what you folks are all going to press. So why don't

2   we start with -- is this Mr. Holdreith?

3            MR. HOLDREITH:  Holdreith.

4            THE COURT:  Holdreith.  Why don't we start there and

5   then I'm going to take a break, I'm going to look at my calendar

6   so we can really sort of drill down here, and then I'll ask the

7   defense group to huddle and see if there's additional comments

8   each wants to make. And, just FYI, I've been dealing with a

9   really bad back issue for a while, so if I stand up and walk

10  around, I'm not getting impatient or anything.

11           MR. HOLDREITH:  You be comfortable, Your Honor.

12           THE COURT:  It's hard to sit, so go ahead.

13           MR. HOLDREITH:  Thanks, Your Honor.  Jake Holdreith

14  from Robins Kaplan for Amneal and the defense group has

15  conferred a bit on this to try to be as streamlined as possible

16  for Your Honor so although I don't speak for any of the other

17  defendants, we have tried to confer as much as possible.

18           THE COURT:  Sure.

19           MR. HOLDREITH:  I hope I will get this mostly right

20  from most people's perspective.

21           The Court knows this is a Hatch-Waxman case.  I know

22  you've tried Hatch-Waxman cases.  I read your I believe it was

23  Apotex and Cephalon decisions that are published.  I think you

24  bifurcated in that case.  I think you tried validity first in

25  that case if I understood it correctly.  I will give you an

1    overview quickly of our defenses.  I will address some of the

2    Court's procedural questions and number of witness questions.

3         Mr. Murnane skipped over really our -- one of our

4    principle infringement defenses, so there is an infringement

5    defense in the case and there's an invalidity defense in the

6    case.  There are all sorts of complex sub-components to those,

7    but those are the two big categories.

8         The high level points, if I could just have the Court

9    have one set of big takeaways on our perspective on the case, it

10   is as Mr. Murnane said this is not the patent that invented or

11   discovered the drug, cinacalcet, or that it can treat

12   parahyperthyroidism.  It is the patent where the inventor said

13   we've figured out how to take that drug, which somebody else

14   discovered, and make it into a tablet that people can then take

15   as a medicament.

16        So the question for us in this case we think is do the

17   defendants' formulations conform to the formulation that's

18   stated in the patent claim or are they different; that's the

19   infringement question.  And on the invalidity side, we think the

20   proper question is would a person working in this field, given

21   cinacalcet and asked to formulate it into oral formulation,

22   would they have expected to succeed.  Would this be an obvious

23   thing to do and to do it in the way that's claimed in the

24   patent?  So those are the big questions.

25        If there were one case the Court wanted to read.  It's

1    very short.   The Federal Circuit has a short three-page decision

2    in a case called Shier v. Watson from early 2017 and it deals

3    with the type of claims we have in this case.   They're a special

4    kind of claim and I'm sorry.   This is patent nerdiness, but it's

5    called a Markush limitation.   M-A-R-K-U-S-H.

6          And a Markush limitation uses magic words.   It says

7    that you pick something from a group consisting of, that's the

8    magic words, "from a group consisting of", and our infringement

9    defense, one of the main ones, pivots off that language which

10   occurs three times in this patent.   So what the patent purports

11   to have invented here is to take the drug and to combine it with

12   three categories of non-drug ingredients, what we call inactive

13   ingredients or excipients, and those categories are be diluent.

14   That just means something to bulk the drug up and give it form

15   and shape.   Secondly, a binder.   It's just like it sounds.   It

16   holds everything together and thirdly, a disintegrant and that's

17   something that helps the drug come apart in the body so that the

18   drug can be exposed to body fluids and be absorbed in the body.

19   So, diluent, binder, disintegrant; each one of those is a

20   Markush limitation in this patent, so it is be diluent, selected

21   from the group consisting of, and then they list three or four

22   things, a binder selected from the group consisting of, and they

23   list three or four things, and finally, disintegrant selected

24   from the group consisting of.

25          Now the Shire v. Watson case and lots of progeny

1  before it teach that when you use that form of claim, you're

2  saying you must use for that limitation those things that are

3  listed and only those things that are listed.  If something from

4  outside that listed group is used, there is no infringement.

5  So many of the infringement defenses here depend on

6  showing one or both of the following; either that a defense

7  formulation does not use one of the listed ingredients for that

8  category, or that it uses one of the listed ingredients and also

9  another ingredient which is not listed.  Each of those leads to

10  non-infringement.  That's a critically important claim

11  construction question in this case.  We think the law is quite

12  plain on this and that Amgen is seeking a quite radical

13  departure from how these Markush limitations are applied.   So

14  that's a high priority issue.  It's explained in Shire v. Watson

15  cited in our papers and I can give the Court the cite if you

16  like.

17  On the invalidity side, our view is this is a simple

18  description of exactly how you take a drug and make an oral

19  formulation out of it.  You add a diluent, a binder and a

20  disintegrant.  That's just the basic thing you do and there are

21  handbooks going back a hundred years that tell you that that is

22  the way to do it, and the excipient is chosen by these named

23  inventors are the most common ones that are used for those three

24  functions.

25  So our view is this is a very, very obvious

1    formulation.   The heavy lifting was to discover the drug and its

2    uses.   That's the patent that's about to expire.   So --

3            THE COURT:   Is that the patent that Judge Bartle

4    opined on?

5            MR. HOLDREITH:   Yes.

6            THE COURT:   And remind me, counsel --

7            MR. HOLDREITH:   That's one of them.   There are a

8    couple.

9            THE COURT:   But generally what Judge Bartle did was --

10   remind me what his ruling was.

11           MR. HOLDREITH:   Well, so that -- I was not involved in

12   that case and I would have to have others speak to that --

13           THE COURT:   What was it?

14           MR. HOLDREITH:   -- the patent --

15           THE COURT:   He can tell me.

16           MR. MURNANE:   That the patent is valid and

17   enforceable.

18           THE COURT:   Got it.

19           MR. HOLDREITH:   Right.

20           MR. MURNANE:   Infringement was admitted.

21           THE COURT:   Understood.

22           MR. HOLDREITH:   So our view is what Amgen is doing

23   here is they are trying to extend the monopoly by taking the

24   drug, explaining a very simple and obvious way to turn it into

25   something that a person can swallow and get a benefit from --

1          THE COURT:  The last time I heard that phrase "extend

2    the monopoly" I ended up with an Actavis case.  So --

3          MR. HOLDREITH:  We're not alleging anti-trust in this

4    case, Your Honor.  All right.  Let me continue a little bit

5    here.

6          There is a prosecution history estoppel issue.  Amneal

7    is not trying that issue.  I won't respond point by point to

8    those prosecution history estoppel points, but there is a

9    non-prosecution history estoppel reason these claims are limited

10   and that equivalents should not be applied, and that is because

11   it would we call it vitiation.  It would just undo what the

12   Markush limitations do.

13         The Markush limitations say it's this group and only

14   this group.  If you then turn around and say well, but you could

15   also use other things that are not in the group and you could

16   also use equivalents, then you're just removing the Markush

17   limitation and turning it into a different limitation.  We think

18   that's impermissible.  We think that's a legal issue, Your

19   Honor.

20         THE COURT:  Did you say that your client who is

21   Amneal, right?

22         MR. HOLDREITH:  Right.

23         THE COURT:  Is not pursuing the estoppel, but other

24   co-defendants are?

25         MR. HOLDREITH:  As we've divided up the case and how

1   we're going to present it to the Court, the Robins Kaplan case

2   and Amneal will not be presenting the prosecution --

3           THE COURT:  Not presenting.

4           MR. HOLDREITH:  Right.

5           THE COURT:  But are you -- what I want to understand

6   is are you saying we don't adopt that theory or we're just going

7   to let someone else present it?

8           MR. HOLDREITH: We're just going to let someone else

9   present it.  We think there should be one and only one

10  construction of the claims here.  The scope is what it is.

11          THE COURT:  Okay.

12          MR. HOLDREITH:  So that said, Your Honor, those are

13  kind of the main themes of the defense case.

14          THE COURT:  Tell me your witnesses.

15          MR. HOLDREITH:  So there are 11 witnesses collectively

16  among all the defendants.  Those really break down in two ways.

17  There's a couple of common witnesses --

18          THE COURT:  Excuse me.

19          MR. HOLDREITH:  Yes.

20          THE COURT:  Continuing apology to everybody for

21  interrupting your thought process, but as the questions come

22  into my head, I want to ask them.  So it's very impolite.  I

23  apologize.

24          Has the defense sat and thought long and hard about

25  the fact that they're not going to be allowed to duplicate

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1    expert witnesses; that is, just because there's multiple -- and

2    this is just general thinking here.  Just thinking out loud.

3    Just because there's multiple defendants doesn't mean I'm going

4    to be amenable to allowing multiple defendants to say the same

5    thing.

6         MR. HOLDREITH:  From Amneal's perspective, yes, and

7    this is a pretty functional defense group in general.  People

8    are pretty much on the same page.  There are some nuances that

9    are important that people want to get out there, but we're

10   working very hard to avoid duplication.

11        THE COURT:  Okay.  Go ahead.

12        MR. HOLDREITH:  If I can do this a little bit upside

13   down, Your Honor.  The invalidity issue on which the defendants

14   bear the burden is the one that is very similar for everybody.

15   The patents are either invalid or not.  They don't depend on the

16   facts of anybody's --

17        THE COURT:  Sure.

18        MR. HOLDREITH:  -- proposed drug.  We have two

19   witnesses on invalidity.  We have Dr. Banackar and he's a

20   gentleman from India.  His name is spelled -- I have to always

21   look at it to get it right.  B-A-N-A-C-K-A-R. He is the witness

22   who will present the invalidity case and why these patents are

23   obvious.

24        THE COURT:  Okay.

25        MR. HOLDREITH:  And then we have a rebuttal witness --

1          THE COURT:  So you don't have to go back, give me your

2  best estimate -- I'm not holding you to it, as to how long you

3  believe his testimony will be, direct and cross.

4          MR. HOLDREITH:  I think Banackar takes a day, Your

5  Honor.

6          THE COURT:  Go ahead.

7          MR. HOLDREITH:  For direct and cross.

8          THE COURT:  Uh-huh.

9          MR. HOLDREITH:  And then we anticipate that Amgen will

10 put on a response witness who will testify to what we call

11 secondary considerations and non-obviousness.  The Court may be

12 familiar with those.  We have a rebuttal witness on that subject

13 named Dr. Rheinstein.  R-H-E-I-N-S-T-E-I-N.  Rheinstein and --

14         THE COURT:  He's going to say what?

15         MR. HOLDREITH:  He will address whatever secondary

16 considerations are offered, but among other things, will

17 challenge the nexus.  I think the Court is aware that when a

18 patentee says my patent is not obvious, there are secondary

19 consideration of non-obviousness.  For example, I sold a lot of

20 the product or people praised my product.  Part of their burden

21 is to show that those indicia are because of the patented

22 features.  We call that nexus.

23         THE COURT:  Go ahead.

24         MR. HOLDREITH:  So among other things, Rheinstein will

25 rebut the nexus and will show that the secondary considerations

1  aren't actually related to what is patented and what is claimed

2  --

3           THE COURT:  But I still have Rheinstein under the

4  category of the topic of invalidity, correct?

5           MR. HOLDREITH:  Yes.  That is correct.

6           THE COURT:  Got it.

7           MR. HOLDREITH:  We then have on the infringement side,

8  everybody has got their expert, so there's nine of them.

9           THE COURT:  Who are yours?

10          MR. HOLDREITH:  Amneal is using a gentleman named

11  McConville.

12          THE COURT:  Spell it, please.

13          MR. HOLDREITH:  And McConville is with C's. M-C,

14  Capital C -- so two C's, O-N-V-I-L-L-E.

15          THE COURT:  And --

16          MR. HOLDREITH:  And his job, as is the job of each of

17  the defense experts for non-infringement, he went through our

18  end our product development these voluminous documents about how

19  the product was made to compare that to the patent claim and so,

20  he will testify, among other things, on the composition of

21  Amneal's proposed product, why it's different from the patent

22  claim.

23          THE COURT:  How long?

24          MR. HOLDREITH:  It depends a little bit on whether

25  Doctrine of Equivalence is asserted.  We're trying to

1  understand.  I think I heard literal infringement today.  If

2  it's only literal infringement, two hours.  If there's a --

3          THE COURT:  Do all of the other defense counsel --

4  again, not holding you to this.  I'm just trying to figure out

5  the lay of the land here.  Each of your non-infringement

6  witnesses about two hours.  Is there anybody that's going to

7  much longer than that?  You can be heard if it's much longer.

8          MR. ESSIG:  Your Honor, this is Chris Essig from

9  Watson.  I think that's generally the estimate that we were

10  going to try to all be in the same ballpark.  If we try to --

11  for purposes of efficiency because we want to make sure we

12  address issues just once and we don't repeat evidence that

13  prosecution history estoppel argument, one expert may take that

14  on for the defense and so one expert --

15          THE COURT:  For everyone.

16          MR. ESSIG:  -- would take a little bit longer.

17          THE COURT:  Sure.  That makes sense.  Okay.  Okay.

18  All right.  So let's do this.  Were you generally finished with

19  your summary?

20          MR. HOLDREITH:  I think so, yes.  If the Court has no

21  more questions --

22          THE COURT:  Yeah.

23          MR. HOLDREITH:  -- it would be a good time for us

24  to --

25          THE COURT:  So let's take about a 10 minute break.

1   What I'm going to do, and it may be a little longer, is I'm

2   going to look -- I've done this before, looking at my calendar.

3   I'm going to look at it again now that I have sort of a better

4   sense of what's what and I'll probably bring my calendar back

5   and we can start talking about maybe some more precise

6   scheduling things.  So give me about 10 or 15 minutes.  Okay.

7        (Recess is taken from 2:38 p.m. until 3:06 p.m.)

8        THE COURT:  Do any other defense counsel want to

9   provide, and remember, we're just at step one, summary of your

10  case that wasn't already articulated by Mr. Holdreith?

11       MR. PAVANE:  I would, Your Honor.

12       THE COURT:  Go ahead.

13       MR. PAVANE:  Briefly, I want to address --

14       THE COURT:  Tell me who you represent.

15       MR. PAVANE:  Sorry. Martin Pavane and I represent the

16  Dr. Reddys defendants.  And I just want to briefly address --

17       THE COURT:  The which defendants?  I'm sorry.

18       MR. PAVANE:  Dr. Reddys.  DRL.

19       THE COURT:  DRL.  Let's use DRL.

20       MR. PAVANE:  Okay.

21       THE COURT:  A lot to remember.  So DRL. Go ahead.

22       MR. PAVANE:  Okay.  So I just wanted to briefly

23  address the prosecution history estoppel arguments that were

24  made by Mr. Murnane earlier today.

25       Firstly, the patent that's at suit here, the 405

1  patent issued from what's called a continuance application of an

2  earlier --

3          THE COURT:  Remember, this is a summary.

4          MR. PAVANE:  Yes.

5          THE COURT:  Summary.  Summary.  We're not arguing the

6  points here.  It's not the trial.  It's a summary.  Go ahead.

7          MR. PAVANE:  It will be five minutes.  No more.

8          THE COURT:  Go ahead. Thank you.

9          MR. PAVANE:  Okay.  So in that application they filed

10 a claim, claim one, and that claim was rejected based on prior

11 art and they eventually dropped that claim in that application.

12 Then they filed what's called a continuation which is the same

13 exact application, it just gets a new filing date.  It's the

14 government's way of getting you to pay another filing fee.  So

15 they put in a new filing fee and they filed that application

16 with that -- only with that same exact claim one.

17          And before the examiner could again reject it, because

18 he had rejected it in the first case, they withdrew it again and

19 they put in a whole set of claims.  The examiner looked at the

20 new set of claims and he rejected those claims on prior art.  He

21 said these are invalid.  We're not patented.

22          At that point, there was the interview that Mr.

23 Murnane said, there was an interview between one of Amgen's

24 lawyers and the patent office and then the examiner issues

25 what's called an examiner's amendment where he adds in

1    additional limitations into the claim.

2            Now, I don't think it requires any deep thought to

3    realize that you don't add limitations into a claim as a

4    patentee or as an applicant for patent unless you have to

5    because every limitation you add narrows your claim, so why

6    would you do that.  So the statement Mr. Murnane said where he's

7    trying to characterize what happened with the file history that

8    they put it in not for reasons of patentability, that's simply

9    not the case.  And, in fact, when the examiner put in his

10   reasons for allowance, because that's what examiners often do is

11   after they finally do allow the claims, they put in a statement

12   for reasons for allowance.  And the examiner did that here

13   several times, and he stated in his reasons for allowance that

14   I'm allowing these claims because of the specific combinations

15   of excipients, and that's the diluent, the binder and the

16   disintegrant that you heard about earlier, and their specific

17   concentration ranges in the claims.  And if you look at these

18   claims, Your Honor, I think you realize that each one not only

19   recites the particular excipients but also a particular weight

20   percentage concentration for each excipient.

21           And the examiner specifically said it's this specific

22   combination of excipients and amounts is the reason I'm granting

23   this application.  So, clearly, he thought these changes that

24   they were adding, which they approved to add by examiner's

25   amendment, were being made for reasons of patentability.  And

1   Mr. Murnane said that the examiner never challenged the

2   statement made by Amgen's lawyer when they put in a self-serving

3   statement saying we didn't make these changes for reasons of

4   patentability, but by the same token, Amgen never challenged the

5   examiner's statement of reasons for allowance where he pointed

6   out why he was specifically allowing the application and on

7   those specific limitations, and that's a classic prosecution

8   history estoppel and that limits them to those specific

9   excipients and ranges without any further application of the

10  Doctrine of Equivalence.

11          Now, the other thing I would point out is that I used

12  to prosecute patent applications earlier in my career and the

13  first thing they teach you when you prosecute patent

14  applications is whenever you make an amendment, throw in a

15  statement that you're not doing it for reasons of patentability.

16  That's patent prosecution 101 from the applicant's side and for

17  that very reason, there are lots of cases out there that say

18  self-serving statements made by the applicant as to the reasons

19  for -- reasons for an amendment are really not to be given

20  weight.  It's for that very reason.

21          And the only other points I want to make, Your Honor,

22  is that -- and I think you alluded to this earlier and you're

23  100 percent correct about this, when you look at a file history

24  and make a determination as to whether there's an estoppel or

25  not, that is a legal question.  It's to limit it specifically by

1  what is in that prosecution history.  You cannot have somebody

2  come from outside and say well, the real reason this was done.

3  No, no, no.  It's got to be in the prosecution history and not

4  only does it have to be in the prosecution history, but if there

5  is an amendment made and there's no explanation for it, it's

6  presumed to be for reasons of patentability.  You can't go

7  outside the record to rebut that presumption.

8          So when you look at the record here, it's crystal

9  clear that their claims were rejected, they made an amendment,

10  they got rejected again.  Then they sat down, they agreed to an

11  examiner's amendment with further amendments narrowing --

12  further narrowing the claim and only then was it allowed and

13  when it was allowed, the examiner told them why it was being

14  allowed because you pointed out to me that it's the specific

15  combination, it was their arguments to the examiner, which are

16  in the record, arguing --

17          THE COURT:  You said this already.

18          MR. PAVANE:  Okay.

19          THE COURT:  You're repeating yourself there.

20          MR. PAVANE:  I didn't say it was their arguments and

21  the record, but yes, okay.  Those are the points I wanted to

22  make.

23          THE COURT:  You're right.

24          MR. PAVANE:  Unless you have any questions --

25          THE COURT:  No.  I'm good.  Thank you.  What was your

1   last name again?

2           MR. PAVANE:   Pavane, P-A-V-A-N-E.

3           THE COURT:   Okay.  Any other defense counsel want to

4   try me?  Okay.

5           I didn't get to ask defense counsel -- well, let me --

6   I didn't get to ask defense counsel their view on the

7   bifurcation issue; that is, let's do invalidity.  Let's tackle

8   that -- I'm sorry.  Infringement, first.  So any problems with

9   that?

10          MR. HOLDREITH:   We tried to caucus on that during the

11  break, Your Honor, which was helpful to have that time and

12  there's a diversity of views on that.  I don't think there's any

13  strong resistance to bifurcating per se.

14          THE COURT:   What's the reason not to?  If you can

15  speak for your co-counsel.  What would be the downside to doing

16  it that way?

17          MR. HOLDREITH:   I would say the only concern among

18  this group is to try to get, and we understand the Court's

19  problems and we want to accommodate the Court in every possible

20  way.  We want to get the soonest final resolution that we can,

21  so whatever we need to do to foster that, we'd like to do.  If

22  that turns out to be bifurcation, great.  If there are other

23  ways to foster that result, great.

24          THE COURT:   Got it.  Okay.

25          MR. HOLDREITH:   And then there's diversity views among

1    the group whether it makes sense to do invalidity first and then

2    infringement or do it the other way around.

3              THE COURT:  Well, speaking for -- are you okay?  Is

4    your client okay with doing infringement first?

5              MR. HOLDREITH:  Whatever --

6              THE COURT:  That's sort of the way I'm leaning.  If I

7    bifurcate, we'll do infringement first.

8              MR. HOLDREITH:  So our thinking is it probably depends

9    on the Court's calendar.  If the Court has --

10             THE COURT:  Here's what I'm thinking.  I'll lay it out

11   for everyone so there's no -- what I'm thinking, subject to

12   everyone's input, is I can give you most of my time starting on

13   -- we're going to have to move a lot around, but starting on the

14   5th, and Steve, we have a bunch of Rule 16s.  A couple of them

15   from Delaware, so we can work with that.  I can give you most of

16   the day the 5th through the 7th, so my proposal, subject to

17   input, would be allow the lawyers to argue the Markush groups

18   and whether they're closed or not now, brief argument.  My

19   understanding is it's really -- the answer is going to be in the

20   cases and I can read the cases and I'll do that, but I'll give

21   brief argument on that now, commit to giving you a quick

22   decision on that so it can inform you as to how to proceed with

23   invalidity.  I keep saying -- I keep mixing them up.  I'm sorry.

24   Infringement and then set those three days for getting as much

25   done or hopefully, everything we can done on infringement and

1   that accommodates Mr. Murnane's request that I get a handle on

2   that and then I can hear intelligently his request for a TRO.

3          What's your reaction to that?

4          MR. HOLDREITH:  Very much appreciate the Court's

5   flexibility.  My one suggestion is in that three day window, it

6   might be tough to get the whole infringement case in.

7          THE COURT:  Uh-huh.  Try as best as we can.

8          MR. HOLDREITH:  It would be pretty easy to get the

9   whole invalidity case in.  So that was our thinking is if you

10  had a shorter window, maybe invalidity first.  Longer window,

11  maybe infringement first.

12         THE COURT:  I mean maybe -- you know, if we have to go

13  to the 8th.  Let me just see what I have on the 8th.  Hold on.

14  Maybe we'll work late.  We'll see how it goes.  Maybe I'll --

15  yeah I may be able to work on the 8th.  Counsel should also know

16  I'm not a huge fan of -- I think appropriate redirect and

17  recross is good, not to redo the direct and the cross to clarify

18  or amplify.  And I'm not a big fan of re-redirect and re-

19  recross, so maybe we'll go with three days, but it sounds like

20  subject to that, you're good with that plan.

21         MR. HOLDREITH:  That's helpful guidance, but we want

22  to accommodate the Court as much as we can.  We understand

23  you're doing us a favor, too, here.

24         THE COURT:  Well, not really.  It's doing my job, but

25  anyone else before I go to plaintiff's side have a -- want to

1  tell me that that proposed plan is a bad idea and don't be

2  bashful in telling me that it is.  Okay.  I'm asking for your

3  advice.  Okay.  Did you --

4           MR. PAVANE:  Just wanted to clarify.

5           THE COURT:  Yes, sir.

6           MR. PAVANE:  So you were going to have an argument on

7  the Markush group --

8           THE COURT:  Right now.

9           MR. PAVANE:  Right now.

10          THE COURT:  Yes.

11          MR. PAVANE:  Okay.

12          THE COURT:  And then we're still two and a half weeks

13  before the 5th.

14          MR. PAVANE:  Yes.

15          THE COURT:  So I'd let you know as soon as possible

16  where I stand on that.  You'll have a ruling on that.  That'll

17  inform you and then we'll go on the 5th, 6th and 7th, just with

18  the infringement part of the case.

19          MR. PAVANE:  Okay.  So just -- I want to make just one

20  point and that is that the Markush group claims don't resolve

21  all the infringement issues against all defendants.

22          THE COURT:  I understand that.  But I thought that --

23  and correct me if I'm wrong, that helps -- greatly helps

24  everyone prepare for what they have to prepare for on the 5th.

25  It's a ruling that you don't want to be wondering how that's

1    going to go because it could change your testimony.

2          MR. PAVANE:  One hundred percent.  Agreed.

3          THE COURT:  Okay.  Got it.

4          MR. MURNANE:  If I may, Your Honor, very briefly.

5          THE COURT:  Sure.

6          MR. MURNANE:  Thank you very much for Your Honor's

7    considered thoughts.  I'd like to, if I may, just comment on

8    counsel for Amneal's proposition.  I think that a lot has

9    happened here.  Counsel for Amneal said that it may be easier to

10   go with validity first and we're in agreement.  We heard when

11   counsel was first speaking, they only have two witnesses.

12         THE COURT:  But I thought your priorities were

13   convince me that there was infringement so that I could issue a

14   TRO.  Did I mishear you?

15         MR. MURNANE:  Your Honor, I'm trying to do it in the

16   quickest way possible.  Again, we're just being amenable to

17   what's quickest for Your Honor.  There are two issues.  They

18   will say they want to go on the market even if -- I withdraw

19   that, Your Honor.  I see.

20         THE COURT:  If I --

21         MR. MURNANE:  You'll have a ruling at that time on the

22   infringement.

23         THE COURT:  Well, no I'm not -- no, I'm not committing

24   to that, but I thought that your preference was you wanted a

25   time to convince me that they infringed and therefore, issue a

1    TRO --

2               MR. MURNANE:  Correct.

3               THE COURT:  -- and if that's your priority, I would

4    think that you would be amenable to getting as much of the

5    infringement cases we could in for those three days so I could

6    make that judgment.

7               MR. MURNANE:  That's correct, Your Honor.  I guess my

8    only concern -- our only concern on Amgen's side would be with

9    the limited amount of time to the extent everything was not

10   resolved --

11              THE COURT:  Uh-huh.

12              MR. MURNANE:  -- on infringement and there were still

13   some infringement issues out there --

14              THE COURT:  Uh-huh.

15              MR. MURNANE:  -- we thought that it would be most

16   likely that all the validity issues would be resolved.  So, in

17   other words, they have two defenses; invalidity and

18   non-infringement.  If Your Honor were to have heard all of the

19   validity and we were to get Your Honor's thinking on that,

20   perhaps with respect to this third column in the chart, there

21   may be some difference of opinion then rather than today as to

22   whether they say yes, Your Honor, we'll wait for your decision

23   and --

24              THE COURT:  Say -- I didn't follow the last part.

25   Start over.

1          MR. MURNANE:  Forgive me for being unclear.

2          THE COURT:  You're so polite.  Stop apologizing.

3   Nothing you have said has warranted an apology, so --

4          MR. MURNANE:  Thank you, Your Honor.

5          THE COURT:  -- I didn't follow what you were saying.

6   Go ahead.

7          MR. MURNANE:  What we're trying to do is to have the

8   case tried as much as possible for the issues -- we have two;

9   validity and infringement.  From what we heard from Amgen's

10  (sic) counsel, and we appreciate it, it sounded as if validity

11  could be done more quickly.  There are fewer witnesses, far

12  fewer witnesses.

13         THE COURT:  He clearly said that.

14         MR. MURNANE:  Okay.  Far fewer witnesses.  That way,

15  if at that point in the proceedings we have resolution there and

16  hopefully the resolution is this is a valid patent, okay.  This

17  patent is presumed valid by statute --

18         THE COURT:  Right.

19         MR. MURNANE:  Well, and I can go over the points, but

20  I'm not going to belabor -- take up Your Honor's time on that.

21  We have disagreements on the points that the defendants have

22  said.

23         THE COURT:  We're still -- if we do that, we still

24  have to tackle the infringement.

25         MR. MURNANE:  Correct.  However, one issue hopefully

1   will have been completely taken care of, and if we all hear that

2   the Court's view is this is a valid patent, our hope would be

3   that perhaps at that time, since there's not going to be that

4   many defendants who are even within an ability to launch.  You

5   have to have tentative approval first, then you have to -- if

6   you have tentative approval, you could perhaps get the final

7   approval.  If we're down to just a defendant or maybe it's only

8   going to be one at that point, maybe we can work something out

9   schedule-wise, but one full issue for everyone will have been

10  taken care of.

11          THE COURT:  Got it.  So your point is it's more

12  productive to get one issue decided, but that includes -- I mean

13  did you want me to write findings of facts and conclusions of

14  law?  When am I going to do that?  Do you want me to just wing

15  it from the bench and say the patent is valid or it's not?  I

16  don't want to do that.

17          MR. MURNANE:  Understood, Your Honor, but perhaps we'd

18  have some sense --

19          THE COURT:  I want to write something.

20          MR. MURNANE:  I understand.  And that would be the

21  case on infringement as well, Your Honor.

22          THE COURT:  Right, but -- right, but I could rule from

23  the bench on your TRO, right?

24          MR. MURNANE:  Correct.  And you could, in fact, if we

25  just did validity first, you could say well, you know, TRO --

1    there is a likelihood of success here on validity.  And, again,

2    we heard what the defendants said. They have nine witnesses for

3    infringements but only two for validity.  We've only got three.

4              THE COURT:  Yeah, but the infringement witnesses, as I

5    understand it, it's going to be pretty cut and dry.  So, listen,

6    I can -- I can give you folks the 5th, 6th and the 7th.  Okay.

7    Is there an agreement as to which part of the case you want to

8    try to get?  I can give you those three days and maybe the next

9    day, but I can't give you seven straight days.  That's not

10   negotiable.  Okay.  So is there an agreement?  Do you want me to

11   leave and see -- if you folks all agree that I should do

12   invalidity first, fine.  I'll defer to you.  Do you want to

13   huddle and I'll leave for five minutes?

14             MR. MURNANE:  May we, Your Honor?

15             THE COURT:  Yeah.

16             MR. MURNANE:  Thank you very much.

17             THE COURT:  If there's a consensus, I agree with you

18   folks.  All right.  So I'll give you 10 minutes.  Okay.

19        (Recess is taken from 3:23 p.m. until 3:29 p.m.)

20             THE COURT:  Is there a consensus?

21             MR. HOLDREITH:  I haven't had a chance to confer with

22   this side of the table.  I'm not sure I have consensus here, but

23   I have hopefully a coherent thought.

24             THE COURT:  All right.  Well, Mr. Murnane, I have to

25   ask.  If we do -- the last thing you said was invalidity is

1  quicker.  Let's get a resolution on that in the three days we

2  have to work with, but if we do that, and I say you have a valid

3  patent, I can't grant a TRO on that.  Right?

4          MR. MURNANE:  Understand.

5          THE COURT:  So then what?

6          MR. MURNANE:  Understood, Your Honor.  Well, then

7  perhaps we will hear then from the defendants that they are

8  ready to commit to not launch -- we have an adjudicated --

9          THE COURT:  I want to know what you want to do,

10  though.  I can't force them to tell me what -- I can't go to

11  this side of the table and say if I find -- if I reject your

12  invalidity case, what are you going to do.  They're going to go

13  we don't know and I'm not going to ask them that question.  What

14  do you want to do?  What's your preference?  What do you want to

15  do in those three days that I can give you?

16          MR. MURNANE:  Validity, because we believe, Your

17  Honor, that infringement will not be completed in those five

18  days.

19          THE COURT:  Okay.

20          MR. MURNANE:  In those three days.

21          THE COURT:  But are you then telling me that you're

22  not going to press for a TRO if I -- if we do it that way?  Are

23  you committed to that?

24          MR. MURNANE:  May I ask my client, Your Honor?

25          THE COURT:  Sure.

1          MR. MURNANE:  Thank you.

2      (Pause)

3          MR. MURNANE:  Thank you for Your Honor's patience.

4  Having conferred, it would be our preference then to go for

5  infringement on those -- those defendants' cases that have the

6  prospects for launch.  It's not everybody, because we don't have

7  tentative proof, so we don't think it will all get done in the

8  time that Your Honor has said for the entire case, but we do

9  believe it can be done for those who have prospects for

10 launching at risk.

11         THE COURT:  Okay.

12         MR. MURNANE:  And so that would be our thought, Your

13 Honor.

14         THE COURT:  Understood.  Thank you.  Defense, what's

15 your preference?

16         MR. HOLDREITH:  Your Honor, I think unfortunately the

17 Court will have to hear from several lawyers on this because

18 people have very different postures.  We do not have tentative

19 approval, so that -- I suspect we're not going to be on one of

20 the ones that wants to be up that week based on what I just

21 heard.

22         I want to make two quick comments.  There was a lot of

23 discussion in our group to make sure the Court will be faced

24 with just trying to make sure there's fairness and that people

25 get up and down so that, you know, you don't hear two days of

```
 1   the case and it's two days of them and nothing from this side.
 2   I know the Court has that in mind, but that was a concern that
 3   was raised here.   And I'm sure the Court has this fully in mind,
 4   but anybody is faced with a PI motion will argue that Amgen
 5   can't show likelihood of success on both prongs; on invalidity
 6   and infringement.
 7               THE COURT:  Understood.
 8               MR. HOLDREITH:  Okay.  Thank you.
 9               THE COURT:  So what's your preference?
10               MR. HOLDREITH:  Sorry?
11               THE COURT:  What's your preference?
12               MR. HOLDREITH:  My preference?
13               THE COURT:  Yeah.  What do you want to do first?
14               MR. HOLDREITH:  We will accommodate the Court.  We
15   will show up.
16               THE COURT:  Of course you will.
17               MR. HOLDREITH:  Whatever part of the case the Court
18   can get to whenever the Court can get to it --
19               THE COURT:  Counsel just said his preference is when I
20   call the case for trial, you'll be here.  I'm asking your
21   opinion.  What do you want to do?
22               MR. HOLDREITH:  I think, Your Honor, with that three
23   day window, it makes sense to do invalidity because we can get
24   it done in a three day window rather than trying infringement
25   piece meal.
```

1          THE COURT:  Okay.  Anyone else have an opinion?

2          MR. PAVANE:  Yeah.  I think a lot of people here feel

3    that infringement would make more sense to try first at least

4    based on the instruction we have.

5          THE COURT:  Because?  Because why?

6          MR. PAVANE:  Because of the reasons that you

7    mentioned.  Even if you resolve invalidity, we're still going to

8    be faced if somebody decides to launch with you having to decide

9    the infringement issue.  It doesn't resolve anything.  The

10   infringement issue, if we win on that, and everybody has

11   different defenses, that's the end of it and then --

12         THE COURT:  All right.  We're going -- starting on the

13   5th, we're going to start with infringement.  I'm going to leave

14   it up to -- certainly, it's plaintiff's case so however he wants

15   -- plaintiff wants to present their case, they present it and

16   then defense reacts.  We'll see where we are after three days.

17         If there's a good reason to try the case in Delaware,

18   Judge Stark has promised me we can make that happen or, you

19   know, I think we can probably get this courtroom.  Is this still

20   open, Steve?  Did someone claim this?

21         MR. SONNIE:  I'm not sure, Judge.

22         THE COURT:  Yeah.  We'll get a techie courtroom for you

23   if you want to do it here.  Is there any reason -- pressing

24   reason why we should try it in Delaware?  No?  Everyone okay

25   here?  Okay.

1            MR. MURNANE:  If I may, Your Honor.  On the

2    plaintiff's side, substantial arrangements including financial

3    arrangements were made for space in Delaware.  We have put

4    deposits down and arranged for space.

5            THE COURT:  You mean like trial prep space?

6            MR. MURNANE:  And hotels.

7            THE COURT:  Hotels?  Are you going to lose money?

8            MR. MURNANE:  Yeah.

9            THE COURT:  You are?

10           MR. MURNANE:  $86,000.

11           THE COURT:  How did you come up with that number so

12   fast?

13           UNIDENTIFIED SPEAKER:  It's in the contract.

14           THE COURT:  And there was no provision in the contract

15   about if the case has to be tried in Philadelphia because

16   everyone knows there's a docket -- docket crisis in Delaware?

17           UNIDENTIFIED SPEAKER:  No, Your Honor.

18           THE COURT:  You didn't think of that?  Well, that's

19   going to be an expense on the Court now for me to come down to

20   Delaware because I live way north of here.  It could be a cost

21   of doing business, but let me think about it.  I'm inclined to

22   just defer to my staff.  So I'll let you know sooner than later.

23   I'll let you know by Tuesday, okay, where we're going to try the

24   case.  All right?

25           All right.  So we've got some time left.  I'm going to

1   give 10 minutes -- yes, sir.

2          MR. PAVANE:  Just real quick.  The point I wanted to

3   ask if there was going to be a selection on the part of the

4   plaintiffs -- excuse me, as to the defendants that are going to

5   be tried in what order.  We'd like some advance notice of

6   that --

7          THE COURT:  Agreed.

8          MR. PAVANE:  -- because obviously we --

9          THE COURT:  Agree.  Agreed.

10         MR. PAVANE:  -- don't want to have to do a fire drill

11  if we don't have to.

12         THE COURT:  Agreed.  So I'll manage it more

13  specifically if I have to.  My sense is that the lawyers are

14  acting incredibly professional and cooperative, but let's leave

15  it general that whatever the lawyers believe is a good faith

16  notice to the other side as to witnesses that are going to be

17  called, you must give the other side good faith notice.  Good

18  faith means enough time for the other side to be prepared with

19  their cross-examination and prepare properly.  Reciprocal

20  courtesy extends obviously.  If the lawyers can't decide on

21  what's good faith notice, then tell me and I'll just -- I mean,

22  we've got four -- you've got four witnesses anyway, so let them

23  know the order of your witnesses and how you're going to present

24  your case.  Okay?

25         MR. MURNANE:  Certainly, Your Honor.

1          THE COURT:  He'll do that.

2          MR. PAVANE:  It wasn't so much the witnesses, because

3   actually the pretrial --

4          THE COURT:  And the order in which --

5          MR. PAVANE:  -- of the defendants that they're going

6   to go after.  That's what -- because they have the same witness

7   for all the defendants.

8          THE COURT:  Yes.  You'll let them know that in enough

9   time to let them prepare.

10         MR. MURNANE:  If I may, Your Honor, that's our fourth

11  column here in that sheet that I handed out.  If we could just

12  get -- we have information from a number of the defendants, but

13  we still don't have responses on getting the FDA correspondence.

14  That's what informs us of how far along they are or are not in

15  getting close to launch capability.  So if everybody would

16  commit to giving us those -- as I said, most of them have, but

17  not everyone has.

18         THE COURT:  For the three -- and it looks like it's

19  Cipla, Strides and Zydus, you folks prepared to let plaintiff's

20  counsel know where you stand?

21         MR. MURNANE:  Zydus has, Your Honor.  Forgive my

22  interruption, Your Honor.  But we have -- as I look at the

23  chart, it's Cipla, correct, Piramel and -- oh they have the 30

24  months.  Forgive me.  So it's Strides and Cipla.

25         THE COURT:  Strides and Cipla, where do you stand?

1          UNIDENTIFIED SPEAKER:  Your Honor, for Cipla, we can

2    let them know by next week what FDA correspondence, if any, we

3    have.

4          THE COURT:  Okay.

5          UNIDENTIFIED SPEAKER:  Your Honor, on behalf of

6    Strides, we can do the same thing.  We believe that we can get

7    the notice out next week.

8          THE COURT:  You're going to have to remember that.

9    I'm not going to put that in an order.  Okay.  You'll remind me

10   if they don't comply.

11         MR. MURNANE:  With that information, we'll be able to

12   know which ones.

13         THE COURT:  Okay.  And then you'll let them know how

14   you're going to --

15         MR. MURNANE:  We will, Your Honor.

16         THE COURT:  And if there's disagreements, I'll stick

17   my nose in, but I'm sure you folks can work that out.  We'll

18   have plenty -- plenty of time to talk about the nitty gritty

19   trial process.  I'll let you know by Tuesday.  Steve or Angela

20   remind me that I want to get them an answer where we're going to

21   try the case by Tuesday.  I'll make myself available up until

22   the 5th vis a vis email through Ms. Whitesell's email address

23   for any procedural questions or issues that need to be addressed

24   before we start the trial.  Counsel, use your good judgment.

25         But it's not -- repeat -- not an opening for you to

```
 1    start arguing and litigating your case to the assigned law clerk

 2    who is my agent and my ears and eyes.  Okay.  It's -- and

 3    obviously, you've got to copy each other, but we can correspond

 4    as we go along vis a vis email instead of getting everyone on

 5    the phone and all that as to different logistical things.  Okay.

 6    And she'll -- I think you already have her email address, but

 7    we'll take care of that.

 8              All right.  Ten minutes, literal 10 minutes aside, on

 9    the Markush issue and whether it's closed or open and let's

10    start with plaintiff.

11              MR. MURNANE:  May I respectfully, Your Honor, since

12    it's their issue, I will go first, but we have very little to

13    say because this is a claim construction --

14              THE COURT:  You want to go second?

15              MR. MURNANE:  Yes, Your Honor.

16              THE COURT:  Okay.  Go ahead.

17              MR. HOLDREITH:  Thank you, Your Honor.  The Court may

18    not have had time to get to the portion of the pretrial order

19    that has just five pages on this topic, so I want to point out

20    to the Court where that is.  It's in Volume II of the pretrial

21    order and it's found in section -- it's in the defendant's

22    findings of fact and conclusions of law.  It's found in Section

23    IIB and that happens to be page 315 of those findings of fact

24    and conclusions of law.  So there's oh, about, five pages of

25    double spaced paragraphs, maybe six, where we lay out what the
```

1    law is here.

2         The short answer is the -- as I mentioned to the Court

3    earlier, these claims contain the magic language "chosen from

4    the group consisting of", and you can see that in the claim.

5    There's no dispute about that.  It's the three limitations we

6    mentioned, diluent, binder and disintegrant.  The most useful

7    case and instructive case on that in my view is the Shire v. --

8         THE COURT:  You mentioned that before.

9         MR. HOLDREITH:  -- Watson.  Right.  And that was a

10   case decided by the Federal Circuit just in 2017 recently, the

11   first part of the year.  The language in that case that I found

12   particularly applicable in this case directly addresses the

13   inclusion of a non-listed ingredient, and I won't go into the

14   technology in that case.  It's a little arcane, but there was a

15   list of things you could have inside the grains in the pill and

16   the things that you could have outside the grain.

17        The plaintiff said well, there's a substance which is

18   outside the grains which is not listed in the claim, but it's

19   not important to the function of this drug, so it shouldn't

20   count.  And the Federal Circuit drew the circle very, very

21   tightly and said no, when you use the language "from the group

22   consisting of", there is a very, very strong presumption that is

23   incredibly difficult to rebut; that that is a closed list and

24   you can include only the members of that list and nothing else,

25   and that the presence of anything else will defeat infringement.

1        That was found true even though there were examples of
2   the patent of other ingredients being included in the
3   description of embodiments in the patent and so even though
4   there was language in the patent specification that suggested
5   you might interpret the claim otherwise, the Court said the
6   presumption is overwhelming based on the language alone and
7   dispositive in that case.
8        The early case that we've cited to the Court that
9   started this line of reasoning is called Multilayer Stretch
10  Cling Film Holdings and that was decided in 2016.  That happens
11  to be 831 F3d 1350 and I'll give you the Shire cite too, as long
12  as I'm at it.
13       THE COURT:  We have that.  I don't need the cite.  If
14  these cites are all in your papers, you don't have to repeat
15  them.  Yeah.  We got them.
16       MR. HOLDREITH:  And that was a case that involved
17  mixing some polymers to make layers of thin films and there was
18  an issue in that case about whether you could include mixtures
19  of listed elements together.  So if you had one of these lists,
20  is it still infringement if there's two members of the list?
21  That's not really a dispute in this case at least from Amneal's
22  perspective.
23       But what Multilayer said is what you can't do is have
24  something from outside the list.  That will defeat infringement.
25       Now, there's an issue in the case because there's a

1  transitional -- what we call a transitional phrase that

2  introduces these limitations called comprising.  And so what

3  this patent says is that this is an oral formulation for a drug

4  comprising certain things and comprising patent lawyers often

5  say that generally means something like including, but not

6  limited to.  So it has to include the drug, it has to include

7  the diluent, it has to include the binder, it has to include the

8  disintegrant and plaintiffs say I think and comprising means it

9  could also include other things.

10         The case law will tell you that introducing the

11  Markush limitations with comprising does not allow you to expand

12  the members of the Markush group for the Markush category.  So

13  you could have things other than diluents, other than binders,

14  other than disintegrants according to this claim, but when it

15  comes to the disintegrants, you can only have the listed ones

16  and when it comes to the binders, you can only have the listed

17  ones and when it comes to the diluents, you can only have the

18  listed ones.  It's a misuse of comprising here to try to use

19  them to reopen those Markush claims.

20         That's a little bit intuitive here because if the

21  groups are open, you really aren't saying anything.  If you're

22  just saying this is a drug with a binder, a diluent and

23  disintegrant, that is such a vague and general claim, it could

24  not possibly have ever been allowed.  These are very important

25  limitations and that's the prosecution history estoppel piece of

1    the case.

2         I won't argue the prosecution history estoppel right

3    now because that really involves the file history in a lot more

4    detail than we can get into, but it would provide an additional

5    reason here to hold these claims closed.

6         The last thing I want to say is when the plaintiff

7    suggests that a closed claim could still include equivalents or

8    other materials, I think they're really trying to give the claim

9    the opposite of its Markush meaning.  If the meaning of the

10   Markush phrase is you may only use the members of the listed

11   group and nothing else, and then you turn around and say but,

12   through the Doctrine of Equivalence or otherwise, I can include

13   other things, you've just voided the limitation.  It's not a

14   limitation anymore.  And so that's not really a plausible

15   application of the Doctrine.

16        I know the Court's time is brief.  I think the cases

17   are very clear and very much on point.

18        THE COURT:  My sense is that the answer -- when I

19   study the cases, the answer is going to be apparent.  Okay.

20        MR. HOLDREITH:  It's fairly clear.

21        THE COURT:  Does any other defense counsel want to say

22   anything about -- on this issue?  No?  No one else?  Okay.

23   Plaintiff.

24        MR. MURNANE:  Thank you, Your Honor.  We are surprised

25   that defendants are seeking a claim construction ruling at this

1    stage.  We had a well thought out and organized schedule in this

2    case and the parties were to meet and confer on terms a year ago

3    and then to exchange terms and then to exchange proposed

4    constructions of terms and we did all that and we had a Markman

5    hearing.  We had a Markman hearing last May and the defendants

6    did not say this was a term that needed to be construed.

7         And today, we hear it is a critical claim construction

8    element of their case.  Your Honor, again, it's very surprising.

9    We never imagined we were going to be having a Markman hearing

10   today on a term that the defendants did not raise.  We just

11   frankly never -- we're flabbergasted that we're doing it and we

12   understand Your Honor is giving them the opportunity to say it,

13   but there was a time, there was an order, everyone agreed to it

14   and the judge ordered it and they didn't do it.

15        THE COURT:  Well, let me interrupt you if you don't

16   mind and ask Mr. Holdreith why wasn't this covered with Judge

17   Sleet at the Markman?

18        MR. HOLDREITH:  At the time -- Your Honor, at the time

19   of the Markman hearing, the parties agreed that the term would

20   have its plain meaning which the Court may know that's --

21   parties frequently just sort of say plain meaning and it doesn't

22   resolve disputes.  In this case, it really didn't resolve the

23   dispute.

24        From Amneal's perspective, we didn't know there was

25   going to be a dispute about this.  We thought the claim meaning

1   a Markush claim was very, very clear and that they were closed.

2   It's now become apparent that the plaintiffs are advancing what

3   we think is a wild theory that you can open these claims back

4   up.  And so that issue will have to be decided to decide the

5   case.

6           THE COURT:  You guys are so prepared you didn't talk

7   about -- you didn't talk about the possibilities of this issue

8   before the Markman?

9           MR. HOLDREITH:  At the time of the Markman, the claim

10  construction or the claim chart that we were given was literal

11  infringement and that we thought they were just going to say

12  that our ingredients are literally the things that are listed in

13  the claims.

14          THE COURT:  Got it.  Okay.  Okay.  Go ahead.

15          MR. MURNANE:  Thank you, Your Honor.  So respectfully

16  because we never expected it, we would respectfully ask that we

17  would be permitted to submit a three page letter on this -- on

18  this topic.  But being here and Your Honor has asked for it, we

19  would invite attention to page 226 in our proposed findings of

20  fact and frankly, since I'm being honest, I'm doing this on the

21  fly here, Your Honor, because I never expected we were going to

22  be doing this.

23          THE COURT:  That's what makes it fun doing it on the

24  fly.

25          MR. MURNANE:  I'm having a great time, Your Honor.

1  It's the second page of our conclusions of law.

2        THE COURT:  Me, too.

3        MR. MURNANE:  Page 226 and so there, paragraph 9, we

4  refer there to the Mannesmann case and noting that where there

5  is both consisting of and --

6        THE COURT:  Tell me the case you want me to read.  You

7  don't have to read from the case.  I'm going to read it.  Give

8  me a case and a cite.

9        MR. MURNANE:  Mannesmann, M-A-N-N-E-S-M-A-N-N Demag

10  D-E-M-A-G Corp versus Engineered --

11        THE COURT:  I got it.  What's the cite?

12        MR. MURNANE:  793 F2d 1279 with particular attention

13  to pages 1282-1283.  It's the Federal Circuit 1986 and there's

14  another case, if I may, Your Honor.

15        THE COURT:  Sure.

16        MR. MURNANE:  In re:  Crish, C-R-I-S-H, 393 F3d, 1253

17  with special attention to 1257, Federal Circuit, 2004.

18        THE COURT:  Got it.

19        MR. MURNANE:  Again, our point is that we are still

20  entitled to equivalents and this kind of ties on to a point that

21  Dr. Reddys' lawyers said when he was at the podium.  When the

22  examiner was speaking about the amended language, this very

23  language that's being pointed to here, the examiner, after a

24  number of different iterations of correspondence, finally said

25  it's the nature of the excipients.  The nature of the

1   excipients, and our view is -- so for this particular Markush

2   group that you're looking at here, the nature of those

3   excipients compared with the nature of the excipients of the

4   accused infringements, that's the proper analysis, Your Honor.

5           THE COURT:  Got it.

6           MR. MURNANE:  Thank you, Your Honor.

7           THE COURT:  Thank you.  Okay.

8           I'll read all those cases.  I'm committed to get you a

9   decision on this sooner than later.  I think we've got a good

10  plan.  I think we accomplished a lot today.  Understanding that

11  we're going to be in contact and communication a lot over the

12  next two weeks, is there anything else anyone wants to talk

13  about?  Yes, sir?  It's okay.  Don't say I'm sorry.

14          MR. MURNANE:  I did ask for the -- if we could submit

15  you a letter on it because we didn't expect we'd be addressing

16  this in light of the earlier schedule with the Markush.

17          THE COURT:  By when?  I don't want to task anyone to

18  work over the weekend, but I want to turn this around.

19          MR. MURNANE:  Tuesday, Your Honor?

20          THE COURT:  Tuesday end of business?

21          MR. MURNANE:  Yes, Your Honor.

22          THE COURT:  Sold.

23          MR. MURNANE:  Thank you, Your Honor.

24          THE COURT:  Sure.  No, you can't respond.  Okay.  I

25  think the answer is in the cases and I can do that.  Anything

 1   else?  All right.  It was nice to meet -- yes.  Go ahead.

 2          MR. HOLDREITH:  Yeah.  We appreciate the Court's time.

 3   If you have any guidance for us on what sort of time horizon the

 4   Court has in mind for this further phase of the trial to be

 5   completed, I realize the Court is juggling chainsaws and

 6   watermelons here, but if there's any sort of guidance you can

 7   give, it would be very helpful.

 8          THE COURT:  I will keep that in mind and let you know

 9   as soon as I get my bearings.  Okay.  All right.  It was nice to

10   meet everybody.  Yes, sir?

11          MR. PAVANE:  I just want to be clear on that.  So

12   they're going to bring a letter by Tuesday and we put in a

13   letter by Tuesday?

14          THE COURT:  I said -- no, you've briefed the matter

15   very extensively.  So -- no.

16          MR. PAVANE:  Okay.  I just want to make one other

17   point.

18          THE COURT:  Yes, sir.

19          MR. PAVANE:  This is in my view not a claim

20   construction issue per se because nobody is disputing what the

21   terms in the claim mean.  This is a legal question about what

22   does a Markush group mean, so it's not a claim construction

23   question and therefore, I don't think it was appropriate to

24   bring it up in front of Judge Sleet.

25          And the second thing I would say since we're --

1          THE COURT:  Yeah.  I thought he said that.  Yeah, I

2     understand.

3          MR. PAVANE:  The second thing I wanted to say is if

4     we're not going to get a chance to put in a response is to just

5     briefly point out that in the cases they cite, the Court simply

6     makes the point that when you have comprising language --

7          THE COURT:  I'm going to be a little transparent here.

8     I looked at this preliminarily.  I think you folks are right on

9     the defense side which is why I want to give him a chance to

10    bring me back to his side.  Okay.  You guys briefed this

11    extensively and I want to give him a chance to convince me I'm

12    going the wrong direction.  What else do you want to tell me?

13         MR. PAVANE:  I think I just accomplished my goal.

14    Thank you.

15         THE COURT:  Okay.  All right.  Nice to meet everybody.

16    I look forward to working with you.

17         IN UNISON:  Thanks, Your Honor.

18         THE COURT:  Have a nice weekend.

19         (Proceedings concluded at 3:56 p.m.)

20

21

22

23

24

25

### CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


*Eileen Dhondt*

EILEEN DHONDT, CET 807
Aequum Legal Transcription


Dated:   February 21, 2018


**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**